ORIGINAL

**UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
AUG 23 2005
U.S. COURT OF FEDERAL CLAIMS

****************************

**CADDELL CONSTRUCTION CO., INC., for the use and benefit of HENDERSON ELECTRIC, HEAT & AIR CONDITIONING, INC.,**

**Plaintiff,**

**v.**

**UNITED STATES ARMY CORPS OF ENGINEERS,**

**Defendant.**

****************************

**No.** 05-915C

**Judge** ________________

## COMPLAINT

### THE PARTIES

1. The Plaintiff, Caddell Construction Co., Inc., for the use and benefit of Henderson Electric, Heat & Air Conditioning, Inc., is an Alabama corporation with its primary place of business in Montgomery, Alabama.

2. Henderson Electric, Heat & Air Conditioning, Inc. (collectively with Caddell Construction Co., Inc., for the use and benefit of Henderson Electric, Heat & Air Conditioning, Inc., "Henderson") is a Florida corporation with its primary place of business in Fort Walton Beach, Florida.

3. The Defendant, the United States Army Corps of Engineers (the "COE"), is a governmental entity that is a subdivision of an executive agency: the United States Department of Defense.

**STATEMENT OF JURISDICTION**

4. This action arises out of a dispute concerning a Contract entered into by the COE, and this Court has jurisdiction pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601, et seq.

**STATEMENT OF FACTS**

5. On September 22, 1999, the COE, Savannah District, awarded Contract No. DACA 21-99-C-0047 (the "Contract"), to the prime Contractor, Caddell Construction Co., Inc. ("Caddell"), Post Office Box 72958, Fort Bragg, North Carolina, 28307, for the First Brigade Barracks Complex at Fort Bragg, North Carolina (the "Project").

6. The Contract awarded to Caddell was based on Caddell's base Contract bid, all options, and all line-item awards in the total amount of $88,908,580.00.

7. Caddell subcontracted with Henderson Electric, Heat & Air Conditioning, Inc. to provide electrical installation and construction services on the Project.

8. The Contract contained clauses governing Changes (Section 00700, Paragraph 109, p. 00700-140), Inspection of Construction (Section 0800, Paragraph 13, Clause 52.246-12, pp. 00800-8 and -9), Division 16 – Electrical (Specifications § 16415, Part 1 General, paragraph 1.2.1 Rules), Division 16 – Electrical (Specifications § 16415, Part 1 General, paragraph 1.4 Workmanship), and Division 16 – Electrical (Specification § 126415, Part 3 Execution, Paragraph 3.2 Wiring Methods, EXECUTION). The Contract also included an implied duty of the COE to cooperate with the contractor in the performance of the Contract, as well as the duty not to unreasonably delay or hinder Contract performance.

9. The COE breached its obligations under the Contract by, without limitation, (a) providing inaccurate, misleading electrical drawings surveys and specifications; (b)

misinterpreting electrical drawings and surveys in such a manner as to impose pragmatically impossible performance burdens on Henderson; (c) failing to give Henderson timely notice of allegedly nonconforming work on the Project; and (d) causing or allowing other contractors to damage Contract work performed by Henderson.

10. On March 4, 2004 Caddell submitted to the COE on behalf of its subcontractor, Henderson, a claim for an equitable adjustment (the "Sprint Damage to Duct Bank Claim") in the amount of $22,441.99 in accordance with the Contract dispute clause and the Contract Disputes Act.

11. By letter dated August 24, 2004, the Contracting officer issued a final decision denying the Sprint Damage to Duct Bank Claim. A copy of the Contracting officer's final decision of August 24, 2004 is attached as Exhibit "A."

12. On January 20, 2004, Caddell submitted to the COE a claim on behalf of its subcontractor, Henderson, for an equitable adjustment (the "Smoke Detector Claim") in the amount of $98,018.49 in accordance with the Contract dispute clause and the Contract Disputes Act.

13. By letter dated September 2, 2004, the Contracting officer issued a final decision denying the Smoke Detector Claim. A copy of the Contracting officer's final decision of September 2, 2004 is attached as Exhibit "B."

14. On November 13, 2003, Caddell submitted to the COE a claim on behalf of its subcontractor, Henderson, for an equitable adjustment (the "Miscellaneous Items Claim") in the amount of $82,560.00 in accordance with the Contract dispute clause and the Contract Disputes Act.

15. By letter dated June 29, 2005, the Contracting officer issued a final decision denying in part the Miscellaneous Items Claim. A copy of the Contracting officer's final decision of June 29, 2005 is attached as Exhibit "C."

16. On November 13, 2003, Caddell submitted to the COE a claim on behalf of its subcontractor, Henderson, for an equitable adjustment (the "Manhole Claim") in the amount of $245,150.00 in accordance with the Contract dispute clause and the Contract Disputes Act.

17. By letter dated June 29, 2005, the Contracting officer issued a final decision denying the Manhole Claim. A copy of the Contracting officer's final decision of June 29, 2005 is attached as Exhibit "D."

18. On January 20, 2004, Caddell submitted to the COE a claim on behalf of its subcontractor, Henderson, for an equitable adjustment (the "Wall Receptacle Claim") in the amount of $45,958.51 in accordance with the Contract dispute clause and the Contract Disputes Act.

19. By letter dated September 22, 2004, the Contracting officer issued a final decision denying the Wall Receptacle Claim. A copy of the Contracting officer's final decision of September 22, 2004 is attached as Exhibit "E."

20. On January 20, 2004, Caddell submitted to the COE a claim on behalf of its subcontractor, Henderson, for an equitable adjustment (the "Circuit/Conduit Claim") in the amount of $282,177.27 in accordance with the Contract dispute clause and the Contract Disputes Act.

21. By letter dated November 1, 2004, the Contracting officer issued a final decision denying the Circuit/Conduit Claim. A copy of the Contracting officer's final decision of November 1, 2004 is attached as Exhibit "F."

22. All legal and contractual conditions precedent to filing of this action have been fulfilled or have been waived.

## COUNT ONE:
## Sprint Damage to Duct Bank Claim

23. Henderson realleges paragraphs 1 through 22.

24. Pursuant to Contract specifications, Henderson installed a direct buried (non-hardened) underground ductbank on the Project. During the Project term, and without Henderson's knowledge or consent, a telecommunications company known to Henderson as "Sprint" came onto the Project site and excavated a trench for the installation of an underground telephone cable in the same area as Henderson's recently-installed ductbank.

25. Sprint, in the course of excavating its trench, damaged the ductbank installed by Henderson, and the COE required Henderson to effect repairs.

26. Sprint was on the Project site installing the subject telecommunications line under Contract with the COE, or with the COE's knowledge and consent.

27. The Contract requires the COE to protect Henderson from interference with Contract work and from damage by other Contractors. See FAR 52.236-8 (Other Contracts).

28. The COE breached the Contract by failing to protect Henderson from Sprint's actions, and by requiring Henderson to effect repairs outside the scope of its Contract work.

29. Henderson submitted its claim to the COE in accordance with the Contract and all applicable law. The Contracting officer has denied this claim in its entirety.

WHEREFORE, Henderson is entitled to additional compensation in the amount of $22,441.99 and/or an equitable adjustment to the Contract for additional work, plus related expenses, including supervision costs, indirect expenses, home and field office overhead costs, profit, interest, and such other relief as the Court may deem just.

**COUNT TWO:**
**Smoke Detector Claim**

30. Henderson realleges paragraphs 1 through 22.

31. The Contract documents did not require the installation of duct-mounted smoke detectors.

32. Henderson did not include the installation of duct-mounted smoke detectors in its bid or in its budget for the Project.

33. The COE required Henderson to install 138 duct-mounted smoke detectors, and has refused to pay Henderson for this additional work.

34. Henderson submitted its claim to the COE in accordance with the Contract and all applicable law. The contracting officer has denied this claim in its entirety.

WHEREFORE, Henderson is entitled to additional compensation in the amount of $98,018.49 and/or an equitable adjustment to the Contract for additional work, plus related expenses, including supervision costs, indirect expenses, home and field office overhead costs, profit, interest, and such other relief as the Court may deem just.

**COUNT THREE:**
**Miscellaneous Items Claim**

35. Henderson realleges paragraphs 1 through 22.

36. The Miscellaneous Items Claim is comprised of four component claims, two of which the contracting officer resolved in favor of Henderson. The remaining and disputed claims components are:

a) the Project specifications were defective so as to cause Henderson to install improperly-sized circuit breakers for the UPS and SPS Systems; and

b) the Project specifications contained defective information as to the physical orientation of the EF Type Fixtures, thus causing Henderson to "rough in" these fixtures incorrectly.

37. These specification defects resulted in Henderson undertaking remedial work that warrants an equitable adjustment to the Contract.

38. Henderson submitted its claim to the COE in accordance with the Contract and all applicable law. The contracting officer has denied the claim components described in paragraphs 36 (a) and (b).

WHEREFORE, Henderson is entitled to additional compensation under the Contract and/or an equitable adjustment to the Contract for additional work, plus related expenses, including supervision costs, indirect expenses, home and field office overhead costs, profit, interest, and such other relief as the Court may deem just.

**COUNT FOUR:**
**Manhole Claim**

39. Henderson realleges paragraphs 1 through 22.

40. Four existing communications manholes at or near the Project site were defectively designed, and the COE made constructive changes to the Contract requiring Henderson to rectify the defects.

41. Specifically, the COE required Henderson to rip out and to reinstall multiple-duct underground ductbanks. Some of the relocated and reconstructed ducts were several feet deeper than the original location, and this resulted in additional expense to Henderson.

42. The sections of the existing ductbanks within five feet of the manholes were encased in concrete. In removing one of these concrete encasements, Henderson unexpectedly encountered and ruptured an active, pressurized 20" water main. The COE required Henderson,

at Henderson's expense, to clean up the damage to the Project site resulting from the massive outflow of water.

43. But for the defectively designed existing manholes and duct banks, Henderson would not have encountered the water main.

44. In accordance with the Contract, Henderson exercised reasonable care by, among other things, coordinating with the Fort Bragg PWBC and ITBC in order to ensure that Henderson would not damage any existing underground utilities during its remediation of the defective manholes.

45. The COE's actual and constructive change to the Contract warrant an equitable adjustment compensating Henderson for the additional expense of repairing the damage caused by the unexpected water main.

46. Henderson submitted its claim to the COE in accordance with the Contract and all applicable law. The contracting officer has denied this claim in its entirety.

WHEREFORE, Henderson is entitled to additional compensation in the amount of $245,150.00 and/or an equitable adjustment to the Contract for additional work, plus related expenses, including supervision costs, indirect expenses, home and field office overhead costs, profit, interest, and such other relief as the Court may deem just.

**COUNT FIVE:**
**Wall Receptacle Claim**

47. Henderson realleges paragraphs 1 through 22.

48. The Contract specifications called for the installation of various electrical wall receptacles throughout the Project site.

49. The COE rejected certain of the receptacles and required Henderson to reinstall or remediate same.

50. The COE constructively changed the Contract by inappropriately rejecting the use of spacers between the yoke of wall receptacles and the metal box mounted in the cavity of the gypsum wall.

51. These inappropriate rejections stemmed in part from the COE employing overzealous and/or incorrect inspection techniques. More specifically, the COE inappropriately used a ground fault testing apparatus to determine the strength and stability of the wall receptacles.

52. Furthermore, the COE constructively changed the Contract by inappropriately rejecting spacers used to fill the gaps between the face of the metal or plastic receptacle box and the face of the gypsum board.

WHEREFORE, Henderson is entitled to additional compensation in the amount of $45,958.51 and/or an equitable adjustment to the Contract for additional work, plus related expenses, including supervision costs, indirect expenses, home and field office overhead costs, profit, interest, and such other relief as the Court may deem just.

**COUNT SIX:**
**Circuit/Conduit Claim**

53. Henderson realleges paragraphs 1 through 22.

54. The Contract drawings contain specifications calling for electrical circuits to be run throughout the Project buildings.

55. The Contract drawings were defective and ambiguous in their depiction of the number of circuits that Henderson would be allowed to run in the same electrical conduit – the Contract drawings were and are subject to more than one interpretation.

56. Adhering to the industry standard and prior course of dealings with the COE, Henderson correctly interpreted the defective and ambiguous drawings in favor of installing two or more circuits in a single conduit.

57. The COE constructively changed the Contact by interpreting the Contract drawings so as to require that each individual circuit be run to the relevant breaker panel in its own separate conduit.

58. As a result of this defect in the Contract documents and the COE's constructive change to the Contract, Henderson incurred significant additional expense.

WHEREFORE, Henderson is entitled to additional compensation in the amount of $282,177.27 and/or an equitable adjustment to the Contract for additional work, plus related expenses, including supervision costs, indirect expenses, home and field office overhead costs, profit, interest, and such other relief as the Court may deem just.

Respectfully submitted,

Dated: August 22, 2005

W. Robert Vezina, III
Florida Bar No. 0329401
Bradley S. Copenhaver
Florida Bar No. 162558
Vezina, Lawrence & Piscitelli, P.A.
318 North Calhoun Street
Tallahassee, Florida 32301
Telephone: (850) 224-6205
Telefacsimile: (850) 224-1353

Attorneys for Plaintiff

DEPARTMENT OF THE ARMY
SAVANNAH DISTRICT, CORPS OF ENGINEERS
P.O. BOX 889
SAVANNAH, GEORGIA 31402-0889

August 24, 2004

REPLY TO ATTENTION OF:
Office of Counsel

SUBJECT: Contracting Officer's Decision - Claim of Caddell Construction Co., Inc. under Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina (MTS No.232107)

Caddell Construction Co., Inc.
P. O. Box 72958
Ft. Bragg, North Carolina 28307

Attention: Monte McKinney
Vice President of Operations

Franklin A. Forbes
Project Engineer

Dear Messrs. McKinney and Forbes:

This decision arises out of Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina. This contract was awarded to Caddell Construction Co., Inc. (Caddell) on September 22, 1999, in the original contract amount of $34,285,000 (Tab 3A).[1] Caddell was eventually awarded the base bid and all options for a total contract amount of $88,908,580. This included construction of a barracks complex with barracks buildings, company operations facilities and associated site work. Notice to proceed was issued and acknowledged on October 20, 1999 (Tab 4).

By letter dated March 4, 2004, Caddell submitted a claim for a sum certain amount of $22,441.99 (Tab 5). Caddell is sponsoring a claim from Henderson Electric Heat & Air Cond., Inc. (Henderson). Henderson believes that the Government is responsible for damage to the

[1] Tabs are referenced for a potential appeal file, with the first two Tabs reserved for the Notice of Appeal and the Contracting Officer's Decision. Copies of the Tabs are not attached to this decision.

EXHIBIT
tabbies
4

4-way direct buried duct bank installed by Henderson between existing communication manhole CM1140 and new communication manhole CMC8. Henderson alleges that the damage was caused when Sprint Telephone (Sprint) installed a direct buried cable which passed directly over the section of the 4-way duct bank between manholes CM1140 and CMC8. Because the work by Sprint was being performed on a Government controlled military installation, Henderson alleges that the Government had control over Sprint. Henderson believes that because of this control, the Government was obligated to prevent Sprint from interfering with Henderson's work. Henderson alleges the Government breached the duty to cooperate with Henderson and not to hinder or delay the performance of the contractor. Henderson therefore believes the Government is responsible for additional costs as a result of the damages by Sprint to the duct bank it installed.

A meeting was held at the Savannah District on July 1, 2004, which was attended by representatives from Caddell and Henderson. The purpose of the meeting was to allow Caddell and Henderson to present additional information for consideration in connection with several claims. During the meeting Caddell and Henderson were invited to submit additional correspondence or information relating to the claims. By letter dated July 10, 2004, from Caddell and letter dated July 7, 2004, from Henderson, both parties requested that a final decision be issued based on the information currently before the Contracting Officer (Tab 6B.)

I have fully reviewed Caddell's claim submission and correspondence along with the contract drawings and specifications. As explained more fully herein, I have concluded that the claim for additional costs for repairing the duct bank between manholes CM1140 and CMC8 is without merit and must be denied.

## FINDINGS OF FACT

1. Contract No. DACA21-99-C-0047 was awarded to Caddell on September 22, 1999, in the original contract amount of $34,285,000 (Tab 3B). Caddell was eventually awarded the base bid and all options for a total contract amount of $88,908,580. (Tab 3A)

2. Notice to Proceed was issued and acknowledged by Caddell on October 20, 1999. (Tab 4)

3. Section 00700, CONTRACT CLAUSES, Paragraph 93, page 00700-120,OTHER CONTRACTS states:

> The Government may undertake or award other contracts for additional work at or near the site of the work under this contract. The Contractor shall fully cooperate with the other contractors and with Government employees and shall carefully adapt scheduling and performing the work under this contract to accommodate the additional work, heeding any direction that may be provided by the Contracting Officer. The Contractor shall not commit or permit any act that will interfere with the performance of work by any other contractor or by Government employees.
> (Tab 3B)

4. Drawing Plate Reference Number ES-41, Sheet 285 is entitled "EXTERIOR POWER AND COMMUNICATION PLAN 'F' OPTION 3." This drawing shows the location of manholes CM1140 and CMC8 (Tab 3C).[2]

5. Henderson's letter to Caddell dated January 6, 2004, states on page 1:

> Henderson Electric acknowledges that Caddell has previously taken the position that this issue should be resolved directly between Henderson Electric and Sprint.
> (Tab 6A)

## ANALYSIS AND CONCLUSIONS

Henderson quotes from the decision in *L.L. Hall Construction Company v. United States*, 177 Ct. Cl. 870, 379 F.2d 559 (1966) which states at page 564: "It is plain that the Government is obligated to prevent interference with orderly and reasonable progress of a contractor's work

[2] See Drawing Plate Reference Number ES-1, Sheet 252 for Electrical Legend and explanation of symbols shown on Plate Reference Number ES-41, Sheet 285. (Tab 3D.)

by other contractors over whom the Government has control." (Tab 5. See Tab 6A for the decision.) While Henderson believes this statement imposes liability on the Government in this case, it does not. The Armed Services Board of Contract Appeals (ASBCA) interpreted this very statement.[3]

The ASBCA stated that the Government is not the guarantor of other contractors' performance and is not liable for delays that it did not cause and over which it had no control. The Government would be liable only for delays caused by its own acts or omissions and if it failed to use reasonable diligence in the performance of its responsibilities under the contract with Caddell. I find no acts or omissions of the Government and no failure to use reasonable diligence in performance of the Government's responsibilities under the contract.

The Government is not responsible for damages caused by Sprint in the performance of work on the installation. Sprint is responsible for the performance of its work and the repercussions of its performance, if any. The Government did not undertake to control the work by Sprint or direct the performance of the work. Negligence on the part of Sprint, if any, does not automatically constitute a breach of a duty of the Government to Caddell or Henderson.

In the contract with Caddell, the Government included a clause that specifically addressed this type of responsibility (FF 3).[4] As Henderson noted, this clause affirmed the responsibility of the contractor not to interfere with the work of other contractors.[5] Sprint's responsibility would be similar for any interference it caused with the work of another

[3] *Centex Construction Inc.*, ASBCA No. 32956, 87-1 BCA P 19,481, *rev'd on other grounds*, 864 F.2d 149 (Fed.Cir. Nov 14, 1988). (Tab 6B.)

[4] "FF" refers to the Findings of Fact section of this decision.

[5] Henderson interprets the language of this clause to create the obligation on the Government to assure that other contractors or Government employees do not interfere with the performance of work under this contract. This is a misreading of this particular clause which places responsibilities on the Contractor.

contractor. I note that Caddell apparently took this same position prior to January 6, 2004, the date of Henderson's Request for Equitable Adjustment (REA) sent to Caddell (FF 5).

I have encouraged Caddell and Henderson to pursue its claim with the appropriate office of Sprint and determine whether they accept responsibility for the purported damage to the duct bank. I continue to encourage the parties to submit pertinent information to Sprint in addition to the information submitted with your claim such as the approximate time frame within which the damage occurred and reasons why it is believed that Sprint caused the damage. Although you have stated that you made attempts to collect from Sprint, you have not provided me with any indication of Sprint's response.

**CONCLUSIONS**

I conclude that the Government is not responsible for the damage purported to have been done by Sprint to the 4-way direct buried duct bank installed by Henderson between existing communication manhole CM1140 and new communication manhole CMC8. Therefore, I find no merit in this claim for the cost of repairing the duct bank. This is the final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, VA 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of

appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

Colleen O'Keefe

Colleen O'Keefe
Contracting Officer

DEPARTMENT OF THE ARMY
SAVANNAH DISTRICT, CORPS OF ENGINEERS
P.O. BOX 889
SAVANNAH, GEORGIA 31402-0889

REPLY TO
ATTENTION OF

2 September 2004

Office of Counsel

SUBJECT: Contracting Officer's Decision - Claim of Caddell Construction Co., Inc. under Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina (MTS No. 232162)

Caddell Construction Co., Inc.
P. O. Box 72958
Ft. Bragg, North Carolina 28307

RECEIVED
SEP 1 8 2004
CADDELL
90922

Attention: Monte McKinney
Vice President of Operations

Robert Nanney
Construction Manager

Franklin A. Forbes
Project Engineer

Dear Messrs. McKinney, Nanney and Forbes:

This decision arises out of Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina. This Contract was awarded to Caddell Construction Co., Inc. (Caddell) on September 22, 1999, in the original contract amount of $34,285,000 (Tab 3A).[1] Caddell was eventually awarded the base bid and all options for a total contract amount of $88,908,580. This included construction of a barracks complex with barracks buildings, company operations facilities and associated site work. Notice to proceed was issued on October 18, 1999 and acknowledged on October 20, 1999 (Tab 5).

By letter dated January 20, 2004, Caddell submitted a claim for a sum certain amount of $98,018.49 (Tab 6). Caddell is actually sponsoring a claim from Henderson Electric Heat & Air

[1] Tabs are referenced for a potential appeal file, with the first two Tabs reserved for the Notice of Appeal and the Contracting Officer's Decision. Copies of the Tabs are not attached to this decision.

EXHIBIT
B

Cond., Inc. (Henderson). Henderson alleges that its claim "involves the purchase and installation of one hundred six (106) duct-mounted smoke detectors." Henderson alleges that 32 of the duct mounted smoke detectors (detectors) were shown on the mechanical drawings and that the directive from Caddell to install these detectors was a constructive change to its contract. Henderson acknowledges that 74 detectors were shown on the electrical drawings and alleges that the specifications were defective concerning which subcontractor should purchase and install the detectors. Henderson alleges that another subcontractor was responsible for the purchase and installation of all of the detectors. Henderson requests that the requirement to install the 32 detectors shown on the mechanical drawings and the requirement to install the 74 detectors shown on the electrical drawings be considered separately.

A meeting was held at the Savannah District on July 1, 2004, which was attended by representatives from Caddell and Henderson. The purpose of the meeting was to allow Caddell and Henderson to present additional information for consideration in connection with several claims. During the meeting Caddell and Henderson were invited to submit additional correspondence or information relating to the claims. By letter dated July 10, 2004 from Caddell and letter dated July 7, 2004 from Henderson, both parties requested that a final decision be issued based on the information currently before the Contracting Officer (Tab 7E). Not withstanding the request made in its July 10, 2004 letter, Caddell and Henderson submitted additional documents by facsimile on August 31, 2004 (Tab 7F). These additional documents were considered during my review and analysis.

I have fully reviewed Caddell's claim submission, correspondence and other documents along with the contract drawings and specifications. As explained more fully herein, I have

concluded that the claim for the cost of purchasing and installing one hundred six (106) detectors is without merit and must be denied.

## FINDINGS OF FACT

1. This Contract was awarded to Caddell on September 22, 1999, in the original contract amount of $34,285,000. Caddell was eventually awarded the base bid and all options for a total contract amount of $88,908,580 (Tab 3A).

2. Notice to Proceed was issued on October 18, and acknowledged on October 20, 1999 (Tab 4).

3. Section 00700, CONTRACT CLAUSES, Clause 101, SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997) states in part at pages 00700-125 and 00700-126:

> (a) ... Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. ...
>
> ...
>
> (c) Where "as shown," "as indicated," "as detailed," or words of similar import are used, it shall be understood that the reference is made to the drawings accompanying this contract unless stated otherwise. ...
>
> (Tab 3B.)

4. Division 13-SPECIAL CONSTRUCTION, Specification Section 13851, FIRE DETECTION AND ALARM SYSTEM, ADDRESSABLE, PART 1 GENERAL, paragraph 1.2.6 Compliance states:

> The fire detection and alarm system and the central reporting system shall be configured in accordance with NFPA 72. The equipment furnished shall be compatible and be UL listed, FM approved, or approved or listed by a nationally recognized testing laboratory in accordance with the applicable NFPA standards.
>
> (Tab 3C.)

5. Division 13-SPECIAL CONSTRUCTION, Specification Section 13851, FIRE DETECTION AND ALARM SYSTEM, ADDRESSABLE, PART 1 GENERAL, paragraph 1.2.7.3 Design Services (Applies to Architectural/Engineering Firm) states in part:

> Installations requiring designs or modifications of fire detection, fire alarm, or fire suppression systems shall require the services and review of a qualified fire protection engineer. ...
> (Tab 3C.)

6. Division 13-SPECIAL CONSTRUCTION, Specification Section 13851, FIRE DETECTION AND ALARM SYSTEM, ADDRESSABLE, PART 1 GENERAL, paragraph 1.4 SUBMITTALS, SD-04 Drawings states:

> Fire Alarm Reporting System; GA/F
>
> Detail drawings, prepared and approved by a Registered Professional Engineer or a NICET Level 3 Fire Alarm Technician, consisting of a complete list of equipment and material, including manufacturer's descriptive and technical literature, catalog cuts, and installation instructions. Note that the contract drawings show layouts based on typical detectors. The Contractor shall check the layout based on the actual detectors to be installed and make any necessary revisions in the detail drawings. The detail drawings shall also contain complete wiring and schematic diagrams for the equipment furnished, equipment layout, and any other details required to demonstrate that the system has been coordinated and will properly function as a unit. Detailed point-to-point wiring diagram shall be prepared and approved by a Registered Professional Engineer or a NICET Level 3 Fire Alarm Technician showing points of connection. Diagram shall include connections between system devices, appliances, control panels, supervised devices, and equipment that is activated or controlled by the panel.
> (Tab 3C.)

7. Division 13-SPECIAL CONSTRUCTION, Specification Section 13851, FIRE DETECTION AND ALARM SYSTEM, ADDRESSABLE, Part 2 PRODUCTS, Paragraph 2.5.2.4. Duct Detectors (Addressable) states in part:

> Duct-mounted photoelectric smoke detectors shall be furnished and installed where indicated and in accordance with NFPA 90A. ...Detectors shall have auxiliary contacts to provide control, interlock, and shutdown functions specified in Section 15950 HEATING, VENTILATING AND AIR CONDITIONING (HVAC) CONTROL SYSTEMS. The detectors shall be supplied by the fire alarm system manufacturer to ensure complete system compatibility.
> (Tab 3C.)

8. Division 13-SPECIAL CONSTRUCTION, Specification Section 13851, FIRE DETECTION AND ALARM SYSTEM, ADDRESSABLE, Part 3 EXECUTION, Paragraph 3.1 INSTALLATION states:

> All work shall be installed as shown and in accordance with the manufacturer's diagrams and recommendations, unless otherwise specified. Smoke detectors shall not be installed until construction is essentially complete and the building has been thoroughly cleaned. (Tab 3C.)

9. Division 13-SPECIAL CONSTRUCTION, Specification Section 13851, FIRE DETECTION AND ALARM SYSTEM, ADDRESSABLE, Part 3 EXECUTION, Paragraph 3.1.4 Detectors states:

> Detectors shall be located and installed in accordance with NFPA 72. (Tab 3C.)

10. Division 15-MECHANICAL, Specification Section 15951, DIRECT DIGITAL CONTROL FOR HVAC, Part 2 PRODUCTS, Paragraph 2.7 SMOKE DETECTORS states:

> Duct smoke detectors shall be provided in supply and return air ducts in accordance with NFPA 90A.
> (Tab 3D.)

11. The following drawings contain the legend applicable to other drawings: Plate E-1, Sheet 457, Sheet 650, Sheet 829, Sheet 913, Sheet 1143. Under the heading "FIRE ALARM AND TELEPHONE" all of the drawings contain a symbol for a duct mounted smoke detector followed by "(FURNISHED UNDER OTHER SECTIONS)." (Tab 4.)

12. Two drawings, Plate E-7, Sheet 1149 and Plate E-7, Sheet 1215, contain symbols for duct mounted smoke detectors. Near the symbols is the note:

> SEE M, MC AND FS PLATES FOR EXACT NUMBER AND LOCATION OF DUCT DETECTORS AND SWITCHES.
> (Tab 4.)

13. Drawing Plate E-8, Sheet 836 contains symbols for duct mounted smoke detectors. Near the symbols is the note:

> REFER TO THE MECHANICAL'S DRAWINGS AND SPECIFICATIONS FOR LOCATION AND NUMBER (TYP)
> (Tab 4.)

14. The following drawings contain "General Notes (Fire Alarm)": Plate E-9, Sheet 739, Sheet 921, Sheet 1002, Sheet 1083. Included in the General Notes is a note that states:

> DUCT SMOKE DETECTORS TO BE PROVIDED BY MECHANICAL SECTION. SEE MECHANICAL PLANS AND SPECIFICATIONS FOR EXACT NUMBER AND LOCATION.
> (Tab 4.)

15. NFPA 90A is a publication of the National Fire Protection Association entitled "Standard for the Installation of Air Conditioning and Ventilating Systems." (Tab 8.)

16. NFPA 90A, paragraph 6.4.2.1 states in part:

> Smoke detectors listed for use in air distribution systems shall be located as follows:
> ...
> (2) At each story prior to the connection to a common return and prior to any recirculation or fresh air inlet connection in air return systems having a capacity greater than 7080 L/sec (15,000 ft³/min) and serving more than one story.
> (Tab 8.)

17. NFPA 72 is a publication of the National Fire Protection Association entitled 'National Fire Alarm Code Handbook." (Tab 9.)

18. NFPA 72, paragraph 5.14.3.1 states:

> To prevent the recirculation of dangerous quantities of smoke, a detector approved for air duct use shall be installed on the supply side of air-handling systems as required by NFPA 90A, *Standard for the Installation of Air-Conditioning and Ventilating Systems*, and 5.14.4.2.1.
> (Tab 9.)

19. NFPA 72, paragraph 5.14.4.2.2 Return Air System states:

> Unless otherwise modified by 5.14.4.2.2.1 or 5.14.4.2.2.2, if the detection of smoke in the return air system is required by other NFPA standards, a detector(s) listed for the air velocity present shall be located where the air leaves each smoke compartment, or in the duct system before the air enters the return air system common to more than one smoke compartment.
> (Tab 9.)

20. The contract requires the construction of 25 buildings. There are electrical and mechanical drawings in the contract for each building. (Tab 4).

21. A total of 104 duct smoke detectors are shown on the contract drawings (Tab 4).

## ANALYSIS AND CONCLUSIONS

In its claim letter dated October 16, 2003 Henderson asked three specific questions. I will address each one in this decision.

"1. As they relate to who is responsible for the purchase and installation of the duct mounted smoke detectors, are the specifications subject to more than [one] reasonable interpretation?"

Henderson requests that the Contracting Officer address the issue of which subcontractor was responsible for providing the detectors. Henderson cannot transfer responsibility and authority to the Government, the drafter of the specifications, to determine how work should be divided among a contractor's subcontractors. Unless the contract expressly provides otherwise, it is the prime contractor's responsibility to divide the work and obtain bids from whichever subcontractors it desires. Even if the specifications are subject to more than one reasonable interpretation concerning which potential subcontractor should perform certain work, it is Caddell's responsibility to determine which subcontractor will perform the work. If it is the custom for trade specialties to prepare bids based on a limited review of the contract drawings and specifications, it is a custom of which prime contractors are aware.

Henderson concedes that the contract drawings show the detectors to be installed (Tab 7E, Henderson letter dated July 7, 2004, page 3). Henderson notes that the drawings in the electrical section referred to drawings in the mechanical section or "other sections." Not only does the contract require the installation and furnishing of all of the detectors, the drawings

contained cross-references to drawings in which the details of the requirement are found. Reading the contract as a whole, the contract could not be clearer that all of the detectors installed by Henderson are required.

Caddell recognized that the furnishing and installation of the detectors was required by the contract and so instructed Henderson in a Request for Information (Tab 7A). Caddell restated this position in response to Henderson's request for additional compensation (Tab 7E, Caddell letter dated 21 April 2000). Caddell interpreted the contract to require the installation of the detectors under Section 13851, paragraph 2.5.2.4.[2] It is well established law that the prime contractor, as the general contractor, has the responsibility to coordinate all trades and assure that each trade is aware of relevant information normally appearing on drawings applicable to other trades. Because Caddell interpreted the requirement for the furnishing and installation of the detectors as falling under the electrical section, Caddell had the responsibility to assure that the electrical subcontractor was aware of the relevant information appearing on the mechanical drawings and in the mechanical section.

As between Caddell, the prime contractor, and the Government, Caddell was responsible for determining the scope of the work required and the amount of its bid. The contract read as a whole unambiguously required the furnishing and installation of the detectors in both the supply and return ducts. Any failure to consider the costs of the detectors was not the responsibility of the Government. It was Caddell's responsibility as the prime contractor.

Although it is my position that the contract clearly required the detectors and that Caddell was responsible for the cost, Henderson alleges the specifications are ambiguous and that the

[2] Henderson concedes that there is no documentation of contemporaneous contact with a Government representative concerning this issue (Tab 7D, page 1).

ambiguity caused confusion between the prime contractor and subcontractors about the costs included in the subcontractors' bids. This relates to Henderson's second question:

"2. As they relate to who is responsible for the purchase and installation of the duct mounted smoke detectors, if the specifications are clear, concise and unambiguous then what is the correct interpretation or what was the intent of the specifications."

Henderson states that 74 detectors are shown on the electrical series drawings and that all of the detectors were located in the supply lines (Tab 7C, Henderson letter dated April 27, 2004, page 2). Henderson states that its subcontract with Caddell included the installation of the fire alarm system and that it was responsible for the work specified in Section 13851, Fire Detection and Alarm System, Addressable (Tab 7C, Henderson letter dated April 27, 2004, page 3). Section 13851 referenced duct mounted smoke detectors in at least two paragraphs (FF[3] 7, FF 10). Clearly, Henderson would have been aware that the contract contained a requirement to furnish and install detectors. Even though the drawings in the electrical section contained a reference to other sections this does not lessen the fact that the detectors were required.

Because the Government does not undertake the responsibility to determine the prime contractor will divide the work among its subcontractors, the reference to items "furnished under other sections" is not a direction by the Government that a certain subcontractor will provide the items. As stated above, the prime contractor is free to contract with others for whatever parts of the work it wishes. Again, it is the responsibility of the prime contractor, Caddell, to ensure that the cost for all of the work required by the contract is included in its bid.

Henderson acknowledges that it is not the Government's responsibility to produce a solicitation that the prime contractor can divide and give only certain sections of the drawings

[3] "FF" refers to the Findings of Fact section of this decision.

and specifications to a subcontractor with the assumption that all of that subcontractor's work is contained in the selected sections (Tab 6, page 14). Yet Henderson insists that the Government decide that its intent was to draft the drawings and specifications to do exactly that, to produce drawings and specifications that made a mechanical subcontractor responsible for the installation of the detectors. Henderson insists that the Government drafted the specifications so that an electrical and a mechanical subcontractor could not determine who was responsible for providing the detectors and that this created ambiguous specifications.

The Government has fulfilled its responsibility when the documents as a whole identify specified work with reasonable clarity. In this case, the contract included the detectors as a requirement and also included references in the electrical drawings to other drawings which contained detectors. Where work is not shown on certain drawings but is shown on others, the prime contractor's duty to coordinate the work of its subcontractors will absolve the Government from liability (FF 3). This is even more true in this case because the drawings contained a cross reference to other sections. If work is required, it must be done no matter where it appears in the contract.

Henderson alleges that it is trade practice for the heating and air conditioning subcontractor to procure and install the duct-mounted smoke detectors. Henderson uses this argument to show that it was not required to furnish and install the detectors under its subcontract.[4] The detectors were included in the specifications and on the drawings and were required to be furnished and installed under the contract. Which subcontractor does the work is not relevant. Trade practice cannot negate a clear contract requirement.

[4] Obviously, the Government is not a party to the contract between Caddell and Henderson and has no knowledge of its terms.

Henderson disputes that it was responsible for the furnishing and installation of detectors in the return air ducts. This relates to Henderson's third question:

"3. Did the Government constructively change the specifications by adding thirty-two duct mounted smoke detectors?"

Division 15, "Mechanical," Section 15951 stated that detectors must be provided where indicated on the drawings in supply and return air ducts in accordance with the National Fire Protection Association (NFPA) publication 90A (FF 10). Henderson interprets this as mandating detectors only where required by NFPA 90A. The plain meaning of "in accordance with" is not to limit the location of detectors to only where NFPA 90A indicates an absolute requirement but to locate detectors consistently with NFPA 90A. The meaning of "accordance" is "agreement" or "conformity."

The contract not only required the installation of detectors consistently with NFPA 90A but also "where indicated" and "as shown" (FF 7, FF 8). According to the contract when the term "as indicated" or "as shown" or similar words are used, "it shall be understood that the reference is made to the drawings accompanying this contract unless stated otherwise" (FF 3). Henderson confirms that 32 detectors were shown on the mechanical drawings in the return ducts. Whether or not NFPA 90A required detectors in the return air ducts is irrelevant because they were indicated on and required by the contract drawings (FF 3, FF 7, FF 8, Tab 4).

Henderson refers to language in the contract requiring the submittal of drawings. (See FF 5.) Henderson quotes the language that requires that the Contractor check the layout based on the detectors to be installed and make revisions to the detail drawings to reflect the actual layout. Henderson believes that this language refers to detectors installed only in accordance with NFPA 90A. Henderson ignores the sentence immediately preceding this language which states: "Note

that the contract drawings show layouts based on typical detectors" (FF 6). In conjunction with this sentence, it is clear that the requirement that the "Contractor shall check the layout based on the actual detectors to be installed and make any necessary revisions in the detail drawings" refers to detectors installed as indicated by the contract drawings and consistent with NFPA 90A. The Contractor must revise the drawings to reflect the location based on the type of the detectors it chose to fulfill the requirements of the contract.

While Henderson does not dispute that detectors were shown in the return air ducts in the mechanical drawings, it chose to ignore this requirement because it relied on the representation of a Registered Professional Engineer or NICET Level 3 Fire Alarm Technician with Honeywell[5] (Engineer or Technician) that "in the application called for on this project, NFPA 90A <u>did not</u> require duct smoke detectors in the return air ducts" (Tab 6, Henderson letter dated October 16, 2003, page 3). The contract required that a qualified fire protection engineer design and review installations requiring designs or modifications of fire detection, fire alarm, or fire suppression systems (FF 5). It also required that a Registered Professional Engineer or a NICET Level 3 Fire Alarm Technician prepare and approve detail drawings consisting of a complete list of equipment and material, including manufacturer's descriptive and technical literature, catalog cuts, and installation instructions (FF 6). The Engineer or Technician was required to prepare and approve a detailed point-to-point wiring diagram showing points of connection, including connections between system devices, appliances, control panels, supervised devices, and

[5] The contract required the installation of a Fire Alarm Control Panel "Honeywell FS90A or approved equal for compatibility with Ft. Bragg Honeywell Delta 1000." See for example Tab 4, Plate E-8, Sheet 836. Apparently Honeywell was chosen by Caddell or Henderson to comply with this requirement.

equipment that is activated or controlled by the panel (FF 6). The contract did not require or authorize the Engineer or Technician to alter the work required by the contract. Henderson's reliance on the purported statement by an Engineer or Technician does not negate the requirements of the contract.

CONCLUSIONS

The Government has done a thorough review of the contract drawings and has determined that there are 104 detectors required by the contract drawings. Henderson indicates that it installed a total of 106 detectors. This discrepancy could be a counting error by either party. However, if Henderson can show where two detectors were installed that are in addition to the detectors shown in the contract, I would be able to find partial merit for the cost of two detectors.

I conclude that the duct smoke detectors were clearly shown in the contract and that it was Caddell's responsibility to ensure the installation of the detectors. I conclude that the Government is not responsible for Henderson's costs for the purchase and installation of one hundred four (104) duct-mounted smoke detectors. I conclude that Henderson has not provided sufficient information for the Government to conclude that there is merit in payment for the cost of an additional 2 detectors. Therefore, I find no merit in this claim for these costs.

This is the final decision of the Contracting Officer on this claim. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, VA 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and

identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

Colleen O'Keefe

Colleen O'Keefe
Contracting Officer

DEPARTMENT OF THE ARMY
SAVANNAH DISTRICT, CORPS OF ENGINEERS
P.O. BOX 889
SAVANNAH, GEORGIA 31402-0889
June 29, 2005

REPLY TO
ATTENTION OF:
Office of Counsel

SUBJECT: Contracting Officer's Decision - Claim of Caddell Construction Co., Inc. under Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina (MTS No.232161)

Caddell Construction Co., Inc.
P. O. Box 72958
Ft. Bragg, North Carolina 28307

Attention: Monte McKinney
Vice President of Operations

Bobby D. Robinson
Attorney in Fact

Franklin A. Forbes
Project Engineer

Dear Messrs. McKinney, Robinson and Forbes:

This decision arises out of Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina. This Contract was awarded to Caddell Construction Co., Inc. (Caddell) on September 22, 1999, in the original contract amount of $34,285,000 (Tab 3).[1] Caddell was eventually awarded all line items in the base bid and all options for a total contract amount of $88,908,580. This included construction of a barracks complex with barracks buildings, company operations facilities and associated site work. Notice to proceed was issued and acknowledged on October 20, 1999 (Tab 6).

[1] Tabs are referenced for a potential appeal file, with the first two Tabs reserved for the Notice of Appeal and the Contracting Officer's Decision. Copies of the Tabs are not attached to this decision.

EXHIBIT
C

By letter dated November 13, 2003, Caddell submitted a claim for a sum certain amount of $82,560 (Tab 7). Caddell is sponsoring a claim from Henderson Electric Heat & Air Cond., Inc. (Henderson). Henderson includes four separate issues in its submission.

1. Henderson alleges that the Government constructively changed the contract when it insisted that electrical wiring and control wiring for the softball field be routed around the perimeter of the field instead of a more direct route under the playing surface of the field.

2. Henderson alleges that the circuit breakers for the uninterrupted power source (UPS) system (called standby power system in the contract) and surge suppressors (also called Transient Voltage Surge Suppressors or TVSS in the contract) were not properly sized in the drawings and specifications.

3. Henderson alleges that the specifications were defective in describing the height and orientation of the EF type fixtures in the entrance wall in front of several of the buildings.

4. Henderson alleges the specifications were defective because dimensions for the openings for Type N1 light fixtures were specified in metric measurements and the fixtures themselves were supplied based on English measurements.

A meeting was held at the Savannah District on July 1, 2004, which was attended by representatives from Caddell and Henderson. The purpose of the meeting was to allow Caddell and Henderson to present additional information for consideration in connection with several claims. During the meeting Caddell and Henderson were invited to submit additional correspondence or information relating to the claims. By letter dated July 10, 2004, from Caddell and letter dated July 7, 2004, from Henderson, both parties requested that a final decision be issued based on the information currently before the Contracting Officer (Tab 9). On January 11, 2005, Henderson and Caddell were given an additional opportunity to submit

information in support of the claims in an e-mail to a representative of Caddell. Additional information was submitted concerning these issues (Tab 10).

I have fully reviewed Caddell's claim submission and correspondence along with the contract drawings and specifications. As explained more fully herein, I have concluded that the claim for the circuit breakers for the TVSS and the claim for the height and orientation of the EF type fixtures are without merit and must be denied. The claim for the cost of circuit breakers for the UPS (or Standby Power System), the claim for the cost of the softball field wiring and the claim based on the dimensions for the openings for the Type N1 light fixtures have merit. A modification has been issued compensating Caddell and Henderson for all costs associated with these issues. Therefore, these issues will not be discussed further in this decision.

## FINDINGS OF FACT

1. This Contract was awarded to Caddell on September 22, 1999, in the original contract amount of $34,285,000. Caddell was eventually awarded all of the line items in the base bid and all options for a total contract amount of $88,908,580 (Tab 3).

2. Notice to proceed was issued and acknowledged on October 20, 1999 (Tab 6).

3. Section 00700, CONTRACT CLAUSES, Clause 109, CHANGES (Aug 1997) states in part at page 00700-140:

> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that cause a change shall be treated as a change order under this clause....
>
> ...
>
> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. ...

(Tab 4)

4. Division 16 ELECTRICAL, Specification Section 16415 ELECTRICAL WORK, INTERIOR, Part 2 PRODUCTS, paragraph 2.4 TRANSIENT VOLTAGE SURGE PROTECTION states in part:

> Transient voltage surge suppressors shall be provided as indicated. Surge suppressors shall meet the requirements of IEEE C62.41 and be UL listed and labeled as having been tested in accordance with UL 1449. ....

(Tab 5.)

5. Division 16 ELECTRICAL, Specification Section 16415 ELECTRICAL WORK, INTERIOR, Part 3 EXECUTION, Section 3.5 RECEPTACLES, paragraph 3.5.2 Transient Voltage Surge Suppressor (TVSS) Receptacles states in part:

> The transient voltage surge suppressor receptacle shall be a NEMA 5-20R duplex receptacle.

(Tab 5.)

6. Drawing Plate Reference Number E-27, Sheet 483 contains the Panelboard Schedule. It shows that the surge suppressor requires a breaker rating of 60 (Tab 12).

7. Drawing Plate Reference Number E-27, Sheet 592 contains the Panelboard Schedule. It shows that the surge suppressor requires a breaker rating of 60 (Tab 12).

8. Drawing Plate Reference Number ES-79, Sheet 320 contains the characteristics of Type EF Wall Mounted Hemisphere light fixtures (Tab 12).

9. Drawing Plate Reference Number ES-85, Sheet 325A contains detail number 2 entitled "Entry Wall Elevation @ Barracks (Typical) (Tab 12).

10. Drawing Plate Reference Number A-6, Sheet 385 contains the Building Elevations for a 96 man barracks (Tab 12). Elevation A on this drawing contains a dashed line around the entry wall feature and a line indicating that detail 2 on Sheet C-117 contains information about this feature. On Elevation A and Elevation B, the bottom of the entry wall feature is at the finished floor elevation (F.F.E.). Note 3 on this drawing states:

> Finish floor elevations, finish grade elevations, and foundation wall heights vary for each building. See civil drawings for finish floor and finish grade elevations and structural drawings for foundation plans regarding footing and foundation elevations.

11. Drawing Plate Reference Number A-6, Sheet 494 contains the Building Elevations for a 128 man barracks (Tab 12). Elevation A on this drawing contains a dashed line around the entry wall feature and a line indicating that detail 2 on Sheet C-117 contains information about this feature. On Elevation A and Elevation B, the bottom of the entry wall feature is at the finished floor elevation (F.F.E.). Note 3 on this drawing states:

> Finish floor elevations, finish grade elevations, and foundation wall heights vary for each building. See civil drawings for finish floor and finish grade elevations and structural drawings for foundation plans regarding footing and foundation elevations.

12. Drawing Plate Reference Number C-117, Sheet 128 contains detail number 2 entitled "Entry Wall Elevation @ Barracks (TYP.)" (Tab 12). This detail refers to detail 4 on the same drawing. Detail 4 depicts a section of the entry wall with measurements for the height of the wall. The detail contains a measurement of 2400 millimeters from a point at the bottom of the wall to the top of a section of 13mm recessed brick. This point at the bottom of the wall is on the footing of the wall. A note on the footing states, "FOOTING-SEE STRUCT." This note directs the contractor to the structural drawings to determine where the point is that begins the measurement.

13. Drawing Plate Reference Number X-2, Sheet 2 contains an index for the drawings associated with this contract (Tab 12). The index shows that Drawing Plate Reference Number C-126, Sheet 137 is entitled, "STRUCTURAL ENTRY WALL DETAILS – BKS. & BATT. HQ."

14. Drawing Plate Reference Number C-126, Sheet 137 shows the Entry Wall Foundation and Framing Sections (Tab 12). A detail in the upper left corner of the drawing is entitled "Entry

Wall Foundation & Framing Sections Barracks." A note on the right side of this detail shows that the bottom of a beam elevation is 2400 millimeters above finished floor, "BOT. OF BM. EL. A.F.F. 2400."

15. Drawing Plate Reference Number C-2, Sheet 13 contains definitions for abbreviations in the drawings (Tab 12). The abbreviation "F.F" is defined as "finished floor."

16. Drawing Plate Reference Number C-42, Sheet 53 is entitled "SITE LAYOUT PLAN 'I' BASE BID AND OPTIONS #1 AND #2" (Tab 12). This drawing shows that the finished floor elevation for Barracks A is 102.65 feet above sea level and the finished floor elevation for Barracks B is 102.45 above sea level.

17. Drawing Plate Reference Number C-43, Sheet 54 is entitled "SITE LAYOUT PLAN 'J' BASE BID AND OPTION #1" (Tab 12). This drawing shows that the finished floor elevation for Barracks C is 102.65 feet above sea level.

18. Drawing Plate Reference Number C-112, Sheet 123 shows the entry walls that are the subject of this claim (Tab 12).

## ANALYSIS AND CONCLUSIONS

### Circuit Breakers for the Surge Suppression System

Under this portion of the claim, Henderson alleges that the specifications for the circuit breakers for what it calls the "surge protection system (SPS)" were defective. In order to adequately address these issues, this decision will clarify the terms used in the contract and in the claim. Henderson uses the abbreviation "SPS" to refer to a "surge protection system." The contract documents use "SPS" to refer to a "Standby Power System." Surge suppression is

required by the contract in the form of Transient Voltage Surge Suppressors (TVSS) also called surge protectors in the contract (FF[2] 6, FF 9). This decision will use the terms in the contract.[3]

TVSS were required in all of the buildings.[4] Henderson alleges that the specifications for the TVSS were defective but provides no support for this allegation. Henderson states that the drawings showing the Panelboard Schedules for the 96 man barracks and the 128 man barracks require a 60 amp circuit breaker for the TVSS (Tab 7, Henderson letter dated November 7, 2003, page 9, FF 6, FF 7). Henderson purchased TVSS that required 15 amp circuit breakers but installed the 60 amp circuit breakers required by the contract. The Government requested Henderson to verify whether the 60 amp circuit breaker was correct for that particular TVSS (Tab 10, 4th page). Because the manufacturer of the TVSS that Henderson installed required a 15 amp circuit breaker, Henderson was required to install the 15 amp circuit breaker to comply with the manufacturer's recommendations. The Government allowed this deviation from the contract requirement so that Henderson could use the TVSS it had chosen. Henderson's claim is for the cost of supplying 15 amp circuit breakers (Tab 7).

Henderson has not shown that it could not acquire a TVSS that used a 60 amp circuit breaker. In fact, the Government verified that TVSS are manufactured that require 60 amp circuit breakers (Tab 11). I conclude that Henderson and Caddell have not shown that the specifications for the TVSS were defective. Henderson and Caddell are not entitled to an equitable adjustment for complying with the manufacturer's recommendations for a product it

---

[2] "FF" refers to the Findings of Fact section of this decision

[3] Reference in the decision to "SPS" is the equivalent of Henderson's reference in its claim to "UPS." Reference in the decision to "TVSS" is equivalent to Henderson's reference in its claim to "SPS."

[4] The project required the construction of 25 buildings: 9 Barracks buildings, 8 Company Operations Facility buildings, 3 Soldier Community buildings, 3 Battalion Headquarters buildings, 1 Brigade Headquarters building, 1 Dining Facility building.

chose to install. Therefore, I find no merit in this claim for the costs of supplying circuit breakers for the TVSS in all buildings.

Height and Orientation of EF Type Fixtures in Barracks Entry Walls

The entry walls that are the subject of this claim are located on the walkways leading to the entrance to the barracks buildings constructed under the contract (FF 9). Henderson does not state in its claim which entry walls for which barracks the claim relates to. However, in the support for its claim, Henderson provides an invoice from G-A Masonry Corp. for additional work. This documentation indicates that the "extra" work was done on Barracks A, B and C (Tab 7). There are three entry walls for Barracks A and two entry walls for Barracks B and C (FF 7, 8 and 9).[5]

Henderson used Detail 2 on Plate Reference Number ES-85, Sheet 325A to determine where to rough in a box for type EF light fixtures on the entry walls. This drawing showed the location of the lights at 3300 millimeters above a line at the bottom of the detail. Henderson measured 3300 millimeters above a concrete slab. Because the ground elevation varied at the entry walls, a measurement of 3300 millimeters from this concrete slab varied where the fixtures were placed within the walls. Neither Henderson nor Caddell discuss what the concrete slab corresponded to on the drawings.

Apparently the brick mason relied on the location for the light fixtures determined by Henderson and framed the brick around these locations. When the brick mason did this, it was discovered that Henderson's location for the light fixtures did not place the fixtures in the positions required by the drawings.

It is common for Architects to tie features in a building to a common point to ensure that all of the architectural features are placed in the correct relationship on each building despite

varying site conditions. This common reference point can be found on the structural drawings. Plate Reference Number A-6, Sheet 494 shows the building elevations for a 128 man barracks (Barracks A) (FF 11). Plate Reference Number A-6, Sheet 385 show the building elevations for a 96 man barracks (Barracks B and C) (FF 10). Both of these drawings show the lights in the entry wall on the same line as the F.F.E or "finished floor elevation" of the second floor of the barracks. Both drawings show the bottom of the wall in the same line as the F.F.E. for the first floor of the barracks. Both of these drawings also indicate that the detail for the entry wall is also shown on Plate reference number C117. [6]

The left side of detail 2 on Plate Reference Number C117, Sheet 128 shows that the lights are located 3300 millimeters above a reference point (Tab 11). On the right side of the detail is a measurement to the bottom of the first beam which is 2400 millimeters from the same reference point. Detail 2 cross references detail 4 shown on the same page. On the right side of detail 4 is the same measurement of 2400 millimeters to the bottom of the beam. This detail also contains the instruction to reference the structural drawings for the footing details, "FOOTING-SEE STRUCT." (FF 12.)

The relevant structural drawing can easily be found by looking at the drawing index at Plate Reference Number X-2, Sheet 2 (FF 13). Civil Drawing Plate Reference Number C-126, Sheet 137 is entitled "Structural Entry Wall Details – Barracks and Battalion Headquarters." The detail on this sheet entitled "Entry Wall Foundation & Framing Sections Barracks" shows that the bottom of the lower beam in the wall is 2400 millimeters above finished floor (abbreviated A.F.F) (FF14). The top of the upper beam is 3800 millimeters above finished floor.

[5] Barracks A is a 128 man barracks. Barracks B and C are 96 man barracks.

[6] A contractor could also refer to Plate Reference Number C-112, Sheet 123 which is entitled, "Architectural Site Details-Legend." The entry walls for the barracks are shown. A reference is made to Plate Reference Number C-117 for each entry wall.

From this detail it is again obvious that the reference point from which these dimensions are measured is the finished floor elevation.

On Plate Reference Number ES-85, Sheet 325A and Plate Reference Number C-117, Sheet 128, the dimension from the reference point that is the finished floor elevation to the bottom of the lower beam is shown on the right side of the detail for the entry wall. The distance from the same reference point to the center of the exterior lights is shown on the left side of the detail. If the reference point on the right side is the finished floor elevation, then the same reference point on the left side is the finished floor elevation.

Plate Reference Number C-42, Sheet 53 is entitled "Site Layout Plan 'I' Base Bid and Options #1 and #2." This drawing shows that the elevation of the finished floor of Barracks A is 102.65 (FF 16). The elevation of the finished floor of Barracks B is 102.45 (FF 16). Plate Reference Number C-43, Sheet 54 is entitled "Site Layout Plan 'J' Base Bid and Options #1." This drawing shows that the elevation of the finished floor of Barracks C is 102.65 (FF 17).

In its Memo to Caddell dated June 25, 2004 (Tab 8, page 6), Henderson discusses Sheet Reference Number C-126, Sheet 137 (Tab 11). Henderson notes that this drawing shows that the top of the upper structural beam of the entry wall is 3800 millimeters above the finished floor elevation. Henderson admits that the line on the drawing from which the dimension is measured is the finished floor and is the same line from which measurements are made on drawing Sheet Reference No. ES-85, Sheet 325A. If Henderson had made its measurement for the location of the entry wall light fixtures from the finished floor elevation, the lights would have been located in the correct position. The drawings containing the building elevations, Plate Reference Number A-6, Sheet 385 and Plate Reference Number A-6, Sheet 494 contain a note that advise

that finish floor elevations vary for each building and that the contractor must consult the civil and structural drawings for the proper elevations.

In the same Memo, Henderson concludes that the reference point in Detail 2 and Detail 4 on Plate Reference Number ES-85, Sheet 325A is in the same elevation as the Type EH light fixtures. It concludes this based on Detail 4. The only measurement on Detail 4 shows the distance from the entry wall for the placement of the Type EH light fixture. As Henderson admits, it does not contain any vertical measurements. Because a Type EH light fixture is installed on the ground a certain distance from the entry wall, the elevation of the ground might be different than the elevation of the footing or the finished floor. Plate Reference Number ES 79, Sheet 320 shows the characteristics of a Type EH light fixture. There are two descriptions of this type of light fixture. One description applies when the fixture is installed in concrete. Another description applies when the fixture is installed in a grassy area. This clearly shows that the fixture is installed at an elevation that is consistent with the site conditions that are 420 millimeters from the edge of the entry wall. The site might be concrete or it might be grassy and the elevations could vary. The only purpose of Detail 4 is to show the distance from the entry wall, not the elevation, of a Type EH light fixture.

Had Henderson measured 3300 millimeters from the finished floor elevation, it would have placed the light fixtures in the proper location. The contract contained several ways to determine what the reference point was on Plate Reference Number 86, Sheet 325A, details 2 and 4. In addition, there is no allegation that the lower and upper beams were located improperly, so obviously Caddell determined the correct reference point for the measurements. Henderson could also have measured from the lower beam to the reference point to determine what the reference point was and used that information to locate the light fixtures.

I conclude that the contract drawings clearly showed the placement of the light fixtures in the entry walls and that Henderson and Caddell failed to correctly locate the fixtures. Therefore, I find no merit in this claim for the costs of relocating the light fixtures and the additional cost for masonry work.

## APPEAL RIGHTS

This is the final decision of the Contracting Officer in these matters. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, VA 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

Rita A. Miles

Rita A. Miles
Contracting Officer

DEPARTMENT OF THE ARMY
SAVANNAH DISTRICT, CORPS OF ENGINEERS
P.O. BOX 889
SAVANNAH, GEORGIA 31402-0889

June 29, 2005

REPLY TO
ATTENTION OF:
Office of Counsel

SUBJECT: Contracting Officer's Decision - Claim of Caddell Construction Co., Inc. under Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina (MTS No.232165)

Caddell Construction Co., Inc.
P. O. Box 72958
Ft. Bragg, North Carolina 28307

Attention: Monte McKinney
Vice President of Operations

Bobby D. Robinson
Attorney in Fact

Franklin A. Forbes
Project Engineer

Dear Messrs. McKinney, Robinson and Forbes:

This decision arises out of Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina. This Contract was awarded to Caddell Construction Co., Inc. (Caddell) on September 22, 1999, in the original contract amount of $34,285,000 (Tab 3).[1] Caddell was eventually awarded all line items in the base bid and all options for a total contract amount of $88,908,580. This included construction of a barracks complex with barracks buildings, company operations facilities and associated site work. Notice to proceed was issued and acknowledged on October 20, 1999 (Tab 5).

By letter dated November 13, 2003, Caddell submitted a claim for a sum certain amount of $245,150 (Tab 6). Caddell is sponsoring a claim from Henderson Electric Heat & Air Cond.,

[1] Tabs are referenced for a potential appeal file, with the first two Tabs reserved for the Notice of Appeal and the Contracting Officer's Decision. Copies of the Tabs are not attached to this decision.

EXHIBIT
D

Inc. (Henderson) alleging that the design of four existing communications manholes parallel with Gruber Road was defective and that the Government made constructive changes to the contract which included correction of the defects. Henderson alleges that as a result of these changes the Government is responsible for the rupture of a water line by Henderson.

A meeting was held at the Savannah District on July 1, 2004, which was attended by representatives from Caddell and Henderson. The purpose of the meeting was to allow Caddell and Henderson to present additional information for consideration in connection with several claims. During the meeting Caddell and Henderson were invited to submit additional correspondence or information relating to the claims. By letter dated July 10, 2004, from Caddell and letter dated July 7, 2004, from Henderson, Henderson provided additional information in response to specific questions from the Government. These comments are not germane to the issues discussed herein and are not included. On January 11, 2005, Henderson and Caddell were given an additional opportunity to submit information in support of the claims in an e-mail to a representative of Caddell (Tab 7). No information concerning this issue was submitted.

I have fully reviewed Caddell's claim submission and correspondence along with the contract drawings and specifications. As explained more fully herein, I have concluded that the portion of the claim for the effort to relocate the duct banks in a location other than what was shown on the drawings has merit. A modification to the contract has been issued that compensates Caddell in the amount of $53,413 for this portion of the claim (Tab 8). Because I found merit regarding this issue and Caddell has been compensated for related damages, I will not discuss it further in this decision.

In its claim Henderson included costs for its efforts to repair and clean the duct banks and manholes after it ruptured a 20" pressurized water line near the manholes. I find that this claim is without merit and must be denied.

## FINDINGS OF FACT

1. This Contract was awarded to Caddell on September 22, 1999, in the original contract amount of $34,285,000. Caddell was eventually awarded all of the line items in the base bid and all options for a total contract amount of $88,908,580 (Tab 3).

2. Notice to proceed was issued and acknowledged on October 20, 1999 (Tab 6).

3. Section 00700, CONTRACT CLAUSES, Clause 92, PERMITS AND RESPONSIBILITIES (NOV 1991) states in part at page 00700-120:

> … The Contractor shall also be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence. …

(Tab 4.)

4 Section 00700, CONTRACT CLAUSES, Clause 94, PROTECTION OF EXISTING VEGETATION, STRUCTURES, EQUIPMENT, UTILITIES, AND IMPROVEMENTS (APR 1984) states in part at page 00700-120:

> (b) The Contractor shall protect from damage all existing improvements and utilities (1) at or near the worksite…the locations of which are made known to or should be known by the Contractor. The Contractor shall repair any damage to those facilities … resulting from failure to comply with the requirements of this contract or failure to exercise reasonable care in performing the work. …

(Tab 4.)

5 Drawing Plate Reference Number ES-2, Sheet 253 contains General Note 6 which states:

> 6. The locations of existing and new utilities shown on the drawings are approximate. The exact locations shall be determined in the field by the Contractor. All work shall be coordinated with that shown on the Civil, environmental and mechanical site drawings.

(Tab 9.)

6. Drawing Plate Reference Number ES-2, Sheet 253 contains General Note 10 which states:

10. Prior to excavating for any underground ductlines or cables, the contractor shall contact the Fort Bragg PWBC and ITBC for coordination of existing underground utilities in the area to be excavated. The location of existing underground lines are approximate and must be field verified by the Contractor. Identified utilities damaged by the contractor shall be repaired by the Contractor immediately and at no additional cost to the Government. All contacts shall be made through the Contracting Officer's representative.

(Tab 9.)

7. Drawing Plate Reference Number ES-23, sheet 269 shows the location of an existing communications manhole labeled "CME1" (Tab 9).

8 Drawing Plate Reference NumberW-7, Sheet 332 shows an underground waterline along Gruber Road (Tab 9).

## ANALYSIS AND CONCLUSIONS

As part of this Project, Henderson was required to install new communications manholes and modifying existing communications duct banks in manholes in an area parallel to Gruber Road (FF[2] 6 and Tab 9 Drawing Plate Reference Number ES-21, Sheet 267). The work Henderson was doing required that it work in the vicinity of the waterline (FF 6, FF 7) and as a result, Henderson was aware of the existence and approximate location of the waterline. Henderson was required to reroute the ducts it installed because they had to enter the manholes at a lower level than what was described by the contract drawings.[3] In planning the new route, Henderson knew it had to avoid the waterline (Tab 6, Henderson letter dated November 6, 2003, page 12).

Henderson acknowledges that on August 27, 2001, Henderson dislodged a piece of concrete that had been part of the encasement for the ductbank. A sharp corner of the concrete ruptured the waterline. Under the contract, Caddell and Henderson were responsible for protecting all existing utilities from damage and was responsible for the repair of any damage

[2] "FF" refers to the "Findings of Fact" section of this Decision.
[3] Caddell and Henderson were compensated for this effort through a bilateral modification to the contract.

resulting from failure to comply with the requirements of the contract or failure to exercise reasonable care in performing the work ((FF 3 and FF 4). Since Henderson was working in the area of the waterline; it had actual knowledge that its work could affect the waterline. Henderson's failure to exercise reasonable care to protect the waterline from damage. As a result the Government is not responsible for the cost to repair or clean and sand out the manholes. I find no merit in the portion of the claim for the costs of repairing the waterline and cleaning manholes affected by its rupture.

## APPEAL RIGHTS

This is the final decision of the Contracting Officer in this matter. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, VA 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Armed Services

Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

Rita A. Miles

Rita A. Miles
Contracting Officer

DEPARTMENT OF THE ARMY
SAVANNAH DISTRICT, CORPS OF ENGINEERS
P.O. BOX 889
SAVANNAH, GEORGIA 31402-0889

REPLY TO
ATTENTION OF:
Office of Counsel

22 September 2004

SUBJECT: Contracting Officer's Decision - Claim of Caddell Construction Co., Inc. under Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina (MTS No. 232158)

Caddell Construction Co., Inc.
P. O. Box 72958
Ft. Bragg, North Carolina 28307

Attention: Monte McKinney
Vice President of Operations

Robert W. Nanney
Construction Manager

Franklin A. Forbes
Project Engineer

Dear Messrs. McKinney, Nanney and Forbes:

This decision arises out of Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina. This Contract was awarded to Caddell Construction Co., Inc. (Caddell) on September 22, 1999, in the original contract amount of $34,285,000 (Tab 3A).[1] Caddell was eventually awarded all line items in the base bid and all options for a total contract amount of $88,908,580. This included construction of a barracks complex with barracks buildings, company operations facilities and associated site work. Notice to proceed was issued on October 18, 1999, and acknowledged on October 20, 1999 (Tab 4).

By letter dated January 20, 2004, Caddell submitted a claim for a sum certain amount of $45,958.51 (Tab 5). Caddell is sponsoring a claim from its subcontractor, Henderson Electric

[1] Tabs are referenced for a potential appeal file, with the first two Tabs reserved for the Notice of Appeal and the Contracting Officer's Decision. Copies of the Tabs are not attached to this decision.

EXHIBIT
E

Heat & Air Cond., Inc. (Henderson). Henderson explains that it is presenting two separate claims. Henderson alleges that the Government constructively changed the contract when it rejected the use of spacers between the yoke of wall receptacles and the metal electrical box mounted in the cavity of the gypsum wall. Henderson further alleges that the Government's use of a ground fault testing apparatus to determine the strength and stability of the wall receptacles was unfair and unwarranted and that the use of the test constructively changed the contract.

A meeting was held at the Savannah District on July 1, 2004, which was attended by representatives from Caddell and Henderson. The purpose of the meeting was to allow Caddell and Henderson to present additional information for consideration in connection with several claims. During the meeting Caddell and Henderson were invited to submit additional correspondence or information relating to the claims, however, no addition information was provided for this claim. By letter dated July 10, 2004, from Caddell and letter dated July 7, 2004, from Henderson, both parties requested that a final decision be issued based on the information currently before the Contracting Officer (Tab 6B).

I have fully reviewed Caddell's claim submission and correspondence along with the contract drawings and specifications. As explained more fully herein, I have concluded that this claim is without merit and must be denied.

## FINDINGS OF FACT

1. This Contract was awarded to Caddell on September 22, 1999, in the original contract amount of $34,285,000. Caddell was eventually awarded all of the line items in the base bid and all options for a total contract amount of $88,908,580 (Tab 3A).

2. Notice to proceed was issued on October 18, 1999, and acknowledged on October 20, 1999 (Tab 4).

3. Section 00700, CONTRACT CLAUSES, Paragraph 109, CHANGES (Aug 1997) states in part at page 00700-140:

> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause....
> ...
> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. ...
> (Tab 3B.)

4. Section 00700, CONTRACT CLAUSES, Paragraph 90, MATERIAL AND WORKMANSHIP (APR 1984) states in part at page 00700-119:

> ...
> (c) All work under this contract shall be performed in a skillful and workmanlike manner. ...
> (Tab 3C.)

5. Section 00800, SPECIAL CONTRACT REQUIREMENTS, Paragraph 13, Clause 52.246-12, INSPECTION OF CONSTRUCTION (AUG 1996) states in part a pages 00800-8 and 00800-9.

> (a) Definition. "Work" includes, but is not limited to, materials, workmanship, and manufacture and fabrication of components.
> (b) The Contractor shall maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to contract requirements. The Contractor shall maintain complete inspection records and make them available to the Government. All work shall be conducted under the general direction of the Contracting Officer and is subject to Government inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the contract.
> ...
> (f) The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price. The Contractor shall promptly segregate and remove rejected material from the premises.
> (Tab 3D.)

6. Division 16 - ELECTRICAL, Specification Section 16415, PART 1 GENERAL, paragraph 1.2.1 Rules states:

> The installation shall conform to the requirements of NFPA 70 and NFPA 101, unless more stringent requirements are indicated or shown.
> (Tab 3E.)

7. Division 16 – ELECTRICAL, Specification Section 16415, PART 1 GENERAL, paragraph 1.4 WORKMANSHIP states:

> Materials and equipment shall be installed in accordance with NFPA 70, recommendations of the manufacturer, and as shown.
> (Tab 3E.)

8. Division 16 - ELECTRICAL, Specification Section 16415, PART 3 EXECUTION, Paragraph 3.3.3 states in part:

> In walls or ceilings of concrete, tile, or other non-combustible material, boxes shall be installed so that the edge of the box is not recessed more than 6 mm from the finished surface.
> (Tab 3E.)

9. NFPA 70 (1999 Edition) is a publication of the National Fire Protection Association entitled "National Electrical Code." (Tab 7.)

10. NFPA 70, Section B. Installation, paragraph 370-20 "In Wall or Ceiling" states:

> In walls or ceilings of concrete, tile, or other noncombustible material, boxes shall be installed so that the front edge of the box will not be set back of the finished surface more than ¼ in. (6.35 mm). ...
> (Tab 7.)

11. NFPA 70 Section B. Installation, paragraph 370-21 "Repairing Plaster and Drywall or Plasterboard" states:

> Plaster, drywall, or plasterboard surfaces that are broken or incomplete shall be repaired so there will be no gaps or open spaces greater than 1/8 in. (3.18 mm) at the edge of the box or fitting.
> (Tab 7.)

12. NFPA 70, Section L. Receptacles, Cord Connectors, and Attachment Plugs (Caps), paragraph 410-56 (f), "Receptacle Mounting" states in part:

> (1) Receptacles mounted in boxes that are set back of the wall surface, as permitted in Section 370-20, shall be installed so that the mounting yoke or strap of the receptacle is held rigidly at the surface of the wall.
>
> (2) Receptacles mounted in boxes that are flush with the wall surface or project therefrom shall be installed so that the mounting yoke or strap of the receptacle is seated against the box or raised box cover.
>
> ...
>
> (Tab 7.)

## ANALYSIS AND CONCLUSIONS

In its letter dated December 23, 2003, Henderson states that the claim contains two separate and independent issues and requests that these issues be addressed as separate claims (Tab 5, Henderson letter dated December 23, 2003, page 2).

The first issue is whether the Government inappropriately rejected the use of spacers between the yoke of the receptacles and the metal electrical box. In its Memo to Caddell dated June 25, 2004, Henderson clarified this issue (Tab 6A). Henderson used small nuts or washers to "flush out the space between the face of the metal box embedded in the wall and the face of the gypsum board." Henderson concedes it is not claiming the cost of installing the small nuts or washers used as spacers. Henderson alleges that the rejection of the use of these items as spacers caused it to incur additional labor costs. Although Henderson characterizes this as a separate claim, it does not separate out the costs associated with this claim from the costs associated with its second claim.

The second claim is that the Government tested whether the receptacle was installed correctly and whether the mounting yoke or strap of the receptacle is held rigidly at the surface of the wall by using a tester that was inappropriate for this type of inspection. Because the

Government found deficiencies using this inspection method, personnel from Caddell and Henderson inspected the receptacles using the same technique. Henderson believes that these inspections caused the receptacles to become loose and resulted in Henderson being required to remove, adjust and reinstall a number of receptacles. Henderson believes this caused a constructive change to the contract for which it is entitled to an equitable adjustment for the cost of its labor. In the alternative, Henderson alleges that "prior course of dealings" entitles it to recover costs.

Rejection of nuts and washers as spacers

The contract requires that installation of the interior electrical work conform to NFPA 70 (FF 6, FF 7)[2]. NFPA 70 requires that receptacle boxes be installed so that the front edge of the box is set back of the finished surface no more than ¼ inch or 6.35 millimeters (FF 9).[3] When boxes are recessed from the wall surface, NFPA 70 requires that receptacles be installed so that the mounting yoke or strap of the receptacle is held rigidly at the surface of the wall. The receptacle must be fixed in place so that it will not move. NFPA 70 does not specify the method of securing the receptacle only the final result, that it be held rigidly at the surface of the wall.

Walls were constructed by mounting gypsum board over metal studs. Henderson states that boxes were installed within the cavity of the wall during the rough-in stage of construction prior to the installation of the wall covering and that receptacles are installed in the boxes after the drywall and wall covering subcontractors have completed their work (Tab 5, Henderson letter dated December 23, 2003, page 2). Henderson agrees that the specifications require that the receptacles be installed so that they are firmly in contact with the gypsum board wall surface when the metal box holding the receptacle is recessed no more than 6 mm from the finished

[2] "FF" refers to the Findings of Fact section of this decision.
[3] There is a parallel provision in the contract which requires boxes to be recessed not more than 6 millimeters (FF 8).

surface (Tab 5, Henderson letter dated December 23, 2003, page 4). Henderson states that the subcontractors installing the gypsum board should not force the receptacle box inward which could create a gap of more than ¼ inch between the face of the box and the finished wall. Also, the subcontractor should not cut a hole in the gypsum board for the receptacle that is so large that the mounting yoke does not come in contact with the gypsum board.

Henderson alleges that when the holes are cut by another subcontractor so that it is oversized to the extent that the "rabbit ears" on the mounting yoke will not come in contact with the gypsum board, a "typical fix" is to use metal spacers that are the thickness of a nut or washer to fill the space between the edge of the box and the face of the wall (Tab 5, Henderson letter dated December 23, 2003, page 4). During the construction of Phase I,[4] Henderson used spacers on the mounting screws to compensate for gaps in "rare instances" when the box was inadvertently set too far back in the wall or "quite frequently" when the drywall subcontractor pushed the box back into the wall or cut the whole in the gypsum board too large (Tab 5, Henderson letter dated December 23, 2003, page 7). Henderson states that these spacers provide more rigid support for the receptacle in situations where the wallboard does not provide support for the mounting yoke. However, Henderson concedes, "the spacers provide additional opportunity for flexing compared to the receptacle yoke being fastened all the way down to the plaster ring." (Tab 5, Henderson letter dated December 23, 2003, page 7.)

During the construction of Phase I, Government Quality Assurance (QA) personnel found some receptacles in recessed boxes with oversize openings. A piece of #12 copper conductor was wrapped in a spiral around the mounting screw between the yoke and the face of the box cover. The copper wire did not provide enough support to allow complete tightening of the

[4] Phase I consisted of the construction of Barracks A, B, C and Soldier Community Building A.

mounting screw, which resulted in these receptacles not being rigidly installed.

The drywall surface is required to have a gap of no larger than 1/8 inch around the edge of the box (FF 11). If this requirement is met, the receptacle mounting yoke can be seated on the drywall surface and held in place without the use of spacers. When this requirement is not met and the holes are oversized, the mounting yoke does not rest on the gypsum wall board (Tab 5, Henderson letter dated December 23, 2003, page 4). The use of spacers does not result in compliance with the requirement of NFPA 70 that the mounting yoke be installed so that it is held rigidly at the surface of the wall (FF 12).

Henderson concedes that some holes for receptacles were oversized (Tab 5, Henderson letter dated December 23, 2003, page 4). The holes were cut too large by another subcontractor under the supervision of Caddell. The oversized holes resulted in the need for some sort of spacer to hold the receptacle rigidly and in the proper place. In a letter dated May 6, 2002, to Caddell, Henderson points out:

> "2.) Many items where plates are not flush with wall were pointed out as being caused by deficient wall finishes prior to the QA Inspection. This is not Henderson Electric's responsibility. Many outlet boxes were also over cut and others were pushed back in the wall. We have again removed, added caddy devices and reinstalled in numerous locations. We expect to be reimbursed for this extra material and labor to correct these items." (Tab 5, Henderson letter dated May 6, 2002.)

According to Henderson's own recitation of the facts, there were deficiencies in the drywall that created the problem Henderson was required to correct through the use of caddy devices or spacers.

As part of a resolution of the deficiencies in the installation of the receptacles and the metal boxes, an Underwriter Laboratories, Inc listed[5] "Device Leveler and Retainer" was approved on June 27, 2001 through Transmittal No. 16415-21.1. The description of this type of

[5] There is no evidence that Underwriters Laboratories, Inc approves the use of small washers or nuts.

spacer indicates that it is used for oversized dry wall openings and will make a floating device rigid. The approval cautioned Caddell to ensure that the work was performed so that "device levelers" would not be necessary and that where more than one device leveler was required in a room, the wall itself might need to be corrected (Tab 8B).

Henderson admits "the plastic or porcelain portion of the receptacle needs to be relatively stable in all directions as the user inserts the plug into the receptacle." (Tab 5, Henderson letter dated December 23, 2003, page 5.) The Government QA personnel found that many of the receptacles that were loose were installed in recessed boxes where there were oversized holes. Part or all of the yoke might be in contact with the wall but because the hole was oversized, the area of contact was insufficient to hold the yoke rigidly in place. In those instances where small washers or nuts were installed, the Government rejected receptacles that were not held rigidly in the box.

I find that the contract required that receptacles be installed so that they were held rigidly. The requirement to use spacers to fulfill this requirement was not a constructive change to the contract.

Effect of inspection methods

The Government has the right to inspect work to ensure strict compliance with the terms of the contract (FF 5). The receptacles were required by the contract to be installed so that the mounting yoke or strap of the receptacle is held rigidly at the surface of the wall (FF 6, FF 7, FF 12). The contract did not specify the type of test that the Government would use to ensure that the receptacles met the contract specifications. The Government may use an unspecified test as a basis for the rejection of work as long as the test determines that the work does not comply with the specifications.

The Government tested the receptacles for power and wiring of the terminals with a circuit tester. When the tester is inserted into the receptacle, an observation can be made of whether the receptacle moves into the box which indicates whether the mounting screws have been tightened sufficiently to hold the receptacle rigidly to the surface of the wall or to the box. The inspector would also observe any side-to-side movement of the receptacle. Even an electrical plug could be used to determine whether the receptacle is rigidly installed, the use of a circuit tester to make this assessment is reasonable.

Caddell had a responsibility to perform adequate inspections to ensure that the work performed under the contract conformed to the contract requirements (FF 5). The method of complying with this responsibility was left up to Caddell. It was within Caddell's authority to perform its own inspections before or after a Government inspection. According to Henderson, not only did Caddell use a similar testing technique to the Government's, but Henderson's Project Manager, Field superintendent, electrical foreman, and other workers also used the same testing technique (Tab 5, Henderson letter dated December 23, 2003, page 8). Henderson now argues that this method is inappropriate.

The Government is not privy to the contents of the subcontract between Henderson and Caddell and does not know what responsibilities Henderson had for inspections. Henderson has not shown, and admits that it cannot show, that the Government directed Caddell or Henderson to perform inspections in a particular manner (Tab 6A). As a result, Henderson has not proven that the Government directly or indirectly controlled the frequency, timing or method of inspections by Caddell or Henderson.

In response to questions posed by the Government in preparation for a meeting with Caddell and Henderson, Henderson elaborated on its understanding of the inspection process

(Tab 6A, page 11). Henderson's experience was that Government QA personnel would place a sticker to mark deficiencies with the electrical receptacles. Once the receptacle was marked, Caddell or Henderson inspectors would use a "ground fault detector" and "bend and twist on it observing the movement." This took place even if the deficiency only related to the quality of the finish behind the cover plate and was not related to the rigidity of the receptacle. Henderson states that even after the "test methods were protested,"[6] the "Contractor Quality Control"[7] performed a test "in anticipation of the Corps of engineers[sic] Inspector's test." (Tab 5, Henderson letter dated December 23, 2003, attachment entitled "Nonstandard Inspection Method.")

Caddell and Henderson cannot now argue that the inspection technique used by the Government was inappropriate when Caddell and Henderson adopted the same inspection technique to assess the rigidity of the receptacles. It appears that Caddell and Henderson sometimes performed their tests prior to the Government's test and on receptacles that the Government might not have found to be loose. If the use of a circuit tester caused receptacles to be loosened, according to Henderson's own statements the practices of Caddell and Henderson in performing their inspections exacerbated the number and extent of the deficiencies of which Henderson complains. Henderson has not proven that the Government's actions created the deficiencies it had to correct.

Henderson attempts to make an argument based on "prior course of dealing." It appears that this argument is based on Henderson's statement: "With this unorthodox test procedure, the Corps inspectors established an acceptance standard for electrical receptacles never before encountered by this contractor in all the previous coursed [sic] of dealings." (Tab 5, Henderson

[6] Henderson does not elaborate on how or to whom it protested the test methods.
[7] Henderson does not state whether this is a Caddell or Henderson employee.

letter dated December 23, 2003, page 8.) Henderson's support for this argument is that it has performed other construction contracts for the federal government and that the interior electrical work under the contracts has been similar (Tab 5, Henderson letter dated December 23, 2003, page 12). Apparently Henderson is arguing that it had never been required to meet the standards of NFPA 70 in any other contracts for the federal government. If it is arguing that its work has never been inspected for deficiencies using a circuit tester, it has not provided information concerning contracts in which its work was tested in a different manner.

I find that the inspection method used by the Government inspectors was reasonable.

**CONCLUSIONS**

I conclude that the Government is not responsible for Henderson's costs resulting from its use of spacers on the mounting screws for the receptacles or for costs resulting from inspection of the receptacles. Therefore, I find no merit in this claim for these costs. This is the final decision of the Contracting Officer in this matter. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, VA 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Armed Services Board of Contract

Appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

Colleen O'Keefe

Colleen O'Keefe
Contracting Officer

DEPARTMENT OF THE ARMY
SAVANNAH DISTRICT, CORPS OF ENGINEERS
P.O. BOX 889
SAVANNAH, GEORGIA 31402-0889

November 1, 2004

REPLY TO
ATTENTION OF
Office of Counsel

SUBJECT: Contracting Officer's Decision - Claim of Caddell Construction Co., Inc. under Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina (MTS No. 232168)

Caddell Construction Co., Inc.
P. O. Box 72958
Ft. Bragg, North Carolina 28307

RECEIVED
NOV 05 2004
CADDELL
90117

Attention: Monte McKinney
Vice President of Operations

Robert W. Nanney
Construction Manager

Franklin A. Forbes
Project Engineer

Dear Messrs. McKinney, Nanney and Forbes:

This decision arises out of Contract No. DACA21-99-C-0047, First Brigade Barracks Complex, Ft. Bragg, North Carolina. This Contract was awarded to Caddell Construction Co., Inc. (Caddell) on September 22, 1999, in the original contract amount of $34,285,000 (Tab 3).[1] Caddell was eventually awarded all line items in the base bid and all options for a total contract amount of $88,908,580. This included construction of a barracks complex with barracks buildings, company operations facilities and associated site work. Notice to proceed was issued on October 18, 1999, and acknowledged on October 20, 1999 (Tab 6).

By letter dated January 20, 2004, Caddell submitted a claim for a sum certain amount of $282,177.27 (Tab 7). Caddell is sponsoring a claim from its subcontractor, Henderson Electric

[1] Tabs are referenced for a potential appeal file, with the first two Tabs reserved for the Notice of Appeal and the Contracting Officer's Decision. Copies of the Tabs are not attached to this decision.

EXHIBIT
F

Heat & Air Cond., Inc. (Henderson). Henderson maintains that it is entitled to costs because the Government constructively changed the contract when it interpreted the contract drawings and drawing notes to require that individual circuits be run to the breaker panel in separate conduit. This increased the linear feet of conduit installed. Henderson claims that the specifications are subject to more than one interpretation and are defective. Henderson alleges that the Government should have allowed it to combine two or more circuits in a single conduit based on "the legal theory commonly referred to as prior course of dealings." Henderson also alleges that the Government failed to reject the work in a timely manner (Tab 7, Henderson letter dated December 29, 2003).

A meeting was held at the Savannah District on July 1, 2004, which was attended by representatives from Caddell and Henderson. The purpose of the meeting was to allow Caddell and Henderson to present additional information for consideration in connection with several claims. During the meeting Caddell and Henderson were invited to submit additional correspondence or information relating to the claims after the meeting. By letter dated July 10, 2004 from Caddell and letter dated July 7, 2004 from Henderson, both parties requested that a final decision be issued on this claim based on the information currently before the Contracting Officer (Tab 10).

I have fully reviewed Caddell's claim submission and correspondence along with the contract drawings and specifications. As explained more fully herein, I have concluded that the claim is without merit and must be denied.

**FINDINGS OF FACT**

1. This Contract was awarded to Caddell on September 22, 1999, in the original contract amount of $34,285,000. Caddell was eventually awarded all of the line items in the base bid and all options for a total contract amount of $88,908,580 (Tab 3).

2. Notice to proceed was issued on October 18, 1999, and acknowledged on October 20, 1999 (Tab 6).

3. Section 00700, CONTRACT CLAUSES, Paragraph 109, CHANGES (Aug 1997) states in part at page 00700-140:

> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause....
>
> ...
>
> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. ...

(Tab 4.)

5. Section 00800, SPECIAL CONTRACT REQUIREMENTS, Paragraph 13, Clause 52.246-12, INSPECTION OF CONSTRUCTION (AUG 1996) states in part pages 00800-8 and 00800-9.

> (a) Definition. "Work" includes, but is not limited to, materials, workmanship, and manufacture and fabrication of components.
>
> (b) The Contractor shall maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to contract requirements. The Contractor shall maintain complete inspection records and make them available to the Government. All work shall be conducted under the general direction of the Contracting Officer and is subject to Government inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the contract.
>
> ...
>
> (f) The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price. The Contractor shall promptly segregate and remove rejected material from the premises.

(Tab 4.)

6. Division 16 - ELECTRICAL, Specification Section 16415, PART 1 GENERAL, paragraph 1.2.1 Rules states:

> The installation shall conform to the requirements of NFPA 70 and NFPA 101, unless more stringent requirements are indicated or shown.

(Tab 5.)

7. Division 16 – ELECTRICAL, Specification Section 16415, PART 1 GENERAL, paragraph 1.4 WORKMANSHIP states:

> Materials and equipment shall be installed in accordance with NFPA 70, recommendations of the manufacturer, and as shown.

(Tab 5.)

8. Division 16 - ELECTRICAL, Specification Section 16415, PART 3 EXECUTION, Paragraph 3.2 WIRING METHODS states in part:

> Wiring shall conform to NFPA 70, the contract drawings, and the following specifications. ... Wire fill in conduits shall be based on NFPA 70 for the type of conduit and wire insulations specified.

(Tab 5.)

9. The contract contains ten drawings which provide legends and notes for the series of electrical drawings for the different types of buildings: E-1 Sheet 457, E-1 Sheet 566, E-1 Sheet 650, E-1 Sheet 731, E-1 Sheet 829, E-1 Sheet 913, E-1 Sheet 994, E-1 Sheet 1075, E-1 Sheet 1143, E-1 Sheet 1209. These drawings contain similar or identical symbols and explanations for the symbols. (Tab 12.)

10. These drawings contain this or a similar symbol:




The explanation for this symbol states:

> HOMERUN TO PANELBOARD. NUMBER OF ARROWS INDICATE NUMBER OF CIRCUITS. "P" INDICATES PANELBOARD THE HOMERUN IS SERVED FROM; "1,3" INDICATES THE CIRCUIT NUMBERS IN THE PANELBOARD FOR CONNECTION.

(Tab 12.)

On drawing E-1 Sheet 829, the explanation for this symbol states:

> HOMERUN TO PANELBOARD. NUMBER OF ARROWS INDICATE NUMBER OF CIRCUITS.

(Tab 12.)

11. These drawings contain this or a similar symbol:



The explanation for this symbol states:

> HASH MARKS INDICATE NUMBER OF SIZE 12 AWG CURRENT CARRYING CONDUCTORS IN 16mm RACEWAY, UNLESS OTHERWISE INDICATED. RACEWAYS WITHOUT HASH MARKS CONTAIN 2 #12 AWG CURRENT CARRYING CONDUCTORS IN 16mm RACEWAY UNLESS OTHERWISE INDICATED. (NOTE: GROUNDING CONDUCTORS SHALL BE PROVIDED BUT ARE NOT DENOTED.)

(Tab 12.)

12. Drawings E-1 Sheet 650, E-1 Sheet 829, E-1 Sheet 1143, E-1 Sheet 1209 contain this or a similar symbol:

5C

The explanation for this symbol states:

> NUMBER INDICATES NUMBER OF SIZE 12 AWG CONDUCTORS IN 16mm RACEWAY, UNLESS OTHERWISE INDICATED. *(NOTE: GROUNDING CONDUCTORS SHALL BE PROVIDED BUT ARE NOT INCLUDED IN THE COUNT.)
> *E-1 Sheet 829 includes the following: RACEWAYS WITHOUT HASH MARKS OR ALPHANUMERIC NOTATION CONTAIN 2 #12 AWG CURRENT CARRYING CONDUCTORS IN 16mm RACEWAY UNLESS OTHERWISE INDICATED.

(Tab 12.)

13. Five drawings contain a general note requiring separate neutrals when circuits are combined in office areas. E-4 Sheet 734 and E-4 Sheet 735 contain the following note:

> (GENERAL) SEPARATE NEUTRALS SHALL BE REQUIRED FOR EACH BRANCH CIRCUIT IN OFFICE AREAS. MULTIWIRE CIRCUITS SHALL NOT BE USED.

E-5 Sheet 917, E-5 Sheet 998 and E-5 Sheet 1079 contain the following note:

> MULTIWIRE BRANCH CIRCUITS SHALL NOT BE INSTALLED IN OFFICE AREAS. SEPARATE NEUTRALS ARE REQUIRED.

(Tab 12.)

14. NFPA 70 (1999 Edition) is a publication prepared by the National Electrical Code Committee, sponsored by the National Fire Protection Association and entitled "National Electrical Code." (Tab 11.)

15. NFPA 70, Chapter 1, General, Article 100 Definitions includes the following definition of "Raceway" at page 70-23:

> **Raceway.** An enclosed channel of metal or nonmetallic materials designed expressly for holding wires, cables, or busbars, with additional functions as permitted in this *Code*. Raceways include, but are not limited to, rigid metal conduit, rigid nonmetallic conduit, intermediate metal conduit, liquidtight flexible conduit, flexible metallic tubing, flexible metal conduit, electrical nonmetallic tubing, electrical metallic tubing, underfloor raceways, cellular concrete floor raceways, cellular metal floor raceways, surface raceways, wireways, and busways.

(Tab 11.)

16. NFPA 70, Chapter 3, Wiring Methods and Materials, Article 348 Electrical Metallic Tubing, paragraph 348-8 Number of Conductors in Tubing states:

> The number of conductors permitted in a single tubing shall not exceed the percentage fill specified in Table 1, Chapter 9.

(Tab 11.)

## ANALYSIS AND CONCLUSIONS

In its claim letter dated December 29, 2003, Henderson states that the Government constructively changed the contract when it required that individual circuits be run in their own conduit back to the breaker panel unless specifically shown otherwise on the contract drawings. In the alternative, Henderson argues that the specifications are subject to more than one

reasonable interpretation and are therefore defective (Tab 7, Henderson letter dated December 29, 2003, pages 1 and 3[2]).

In a memo from Henderson to Caddell dated June 25, 2004, Henderson further discusses this issue. Henderson states that the combining of circuits in a single conduit which share the same neutral is standard within the "industry" and is not prohibited by the National Electric Code (NEC) or the contract drawings (Tab 9). Henderson believes that the contract as a whole allowed the combining of circuits in the same conduit as long as it complied with the requirements of the NEC concerning the percentage of fill allowed and degradation (Tab 9).

As part of this issue Henderson argues that the Government failed to reject defective work in a timely manner in the buildings and facilities constructed during Phase I[3] and specifically in the Dining Facility (Tab 7, Henderson letter dated December 29, 2003, page 9).[4] During the construction of the Dining Facility an issue arose concerning the location of a photocell for the operation of exterior lighting. The amount of conduit necessary to install the wiring for the photocell depended on the location. Discussion of this issue prompted the Government to note that the contract required the installation of circuits in separate conduit back to the panel board while Henderson had been installing multiple circuits and multi-wire circuits in the same conduit. In the Dining Facility, Henderson asserts that it pulled out conductors, installed additional conduit and reinstalled circuits with a dedicated neutral conductor.

---

[2] Page number 2 is omitted from the claim letter. The first page is numbered 1 and the second page is numbered 3.

[3] Phase I consisted of the construction of Barracks A, B, C and Soldier Community Building A, Company Operations Facility C and D.

[4] Henderson alleges that the Government had approved what the Government considered to be a deviation from the contract requirements and then withdrew this approval. The only written indication of this approval is Serial Letter 99-47-705 dated January 24, 2002 from the Government to Caddell (Tab 6). This letter states: "In deciding whether to have the circuits corrected in accordance with the contract this office took an extremely reasonable approach and allowed the installation to remain (provided the installation met NEC requirements) in the Phase I buildings." After this letter, Henderson installed conduit and circuits in accordance with the Government's interpretation of the contract.

Henderson states that when the work was rejected, it cost more to correct the work than if the work had been rejected sooner.

Henderson is correct that the contract allowed the installation of multiple circuits in a single conduit that share the same neutral (FF 10, FF 11, FF 12).[5] Two current carrying conductors (one hot or phase conductor and one neutral conductor) and a grounding conductor make up a circuit. Circuits were indicated on the drawings with a solid or broken line depending on whether the circuit was exposed or concealed in conduit.[6] The ten drawings containing the legend for symbols used on the electrical drawings include a symbol to show the number of circuits combined in a "homerun" to the panelboard (FF 10). These drawings also include symbols that denote the number of conductors in a raceway (FF11, FF12). When this symbol was used, multiple "hash marks" indicated multiple current carrying conductors, including a neutral conductor, in a raceway (FF 11).[7] These multiple current carrying conductors could share the same neutral.

There were specific instances where the contract allowed the installation of multiple circuits in a single conduit but with separate neutral conductors. For example, E-5 Sheet 998 details the power and signal plan for the second floor of a Company Operations Facility. In rooms 204, 205 and 206 there are three arrows and six hash marks on the circuits for the receptacles in these rooms. The three arrows indicate three circuits. The six hash marks indicate six current carrying conductors in the conduit. Because there are three circuits and six conductors in the conduit, three conductors are hot conductors and three are neutral conductors.

[5] "FF" refers to the "Findings of Fact" section of this decision.
[6] See the legends on the drawings listed in FF 9.
[7] The term "raceway" can be used interchangeably with "conduit." (FF 15.) From this point on the reference to "conduit" is consistent with the reference to "raceway" on the drawings listed in FF 9.

Each circuit has its own neutral. This is consistent with the general note 1 on this drawing which states that separate neutrals are required in office areas (FF 13).

Henderson is also correct that the contract allowed the combining of circuits in the same conduit (FF11, FF12). Henderson used Plate Reference No. E-4 Sheet 734 as an example that the contract allowed circuits to share the same neutral and to be combined in the same conduit. Rooms 106, 107 and 108 are classrooms and are shown on this drawing as one large room. A circuit numbered "6" starts on the east wall of the room. There are no hash marks on the diagram for the circuit in a conduit. Conduits without hash marks contain two #12 AWG current carrying conductors in addition to a grounding conductor (FF 11). This is the equivalent of one circuit.

Along the north wall, the diagram for the conduit contains three hash marks. This indicates three current carrying conductors in this raceway, which would consist of two "hot" conductors, and one neutral conductor. At the northwestern corner of the room, two arrows numbered "4" and "6" confirm that the conduit contains these two circuits. Along the west wall, the diagram for the conduit contains four hash marks indicating three "hot" conductors and one neutral conductor. At the southwestern corner of the room, three arrows numbered "2," "4," and "6" confirm that these three circuits are in the same conduit and will follow a homerun to panelboard A1.

On the same drawing, the wiring diagram for Room 127 does not include hash marks on any of the conduit. As explained in the legend for this drawing on E-1 Sheet 731, conduit without hash marks contain two #12 AWG current carrying conductors and a grounding conductor. The two current carrying conductors are one hot conductor and one neutral conductor. There is only one arrow on each conduit which confirms that only one circuit is

located in the conduit. In this case the contract is clear that there would not be more than one circuit in the conduit (FF11). Henderson's interpretation that circuits 35 and 37, which are shown in Room 127, could be run in the same conduit is in conflict with the clear description on E-1 Sheet 731 of the symbols used for these circuits (FF 10, FF 11).

Henderson argues that NFPA 70[8] allowed it to combine circuits in a single conduit sharing the same neutral subject to the fill and derating requirements of NFPA 70 (FF 16). It argues that it should have been allowed to comply only with the requirements of NFPA 70 in the installation of all of the circuits. Henderson disregards the contract specifications that advise the contractor that installation must conform to the requirements of NFPA 70 "unless more stringent requirements are indicated or shown." (FF 6.) The contract also stated that wiring shall conform not only to NFPA 70 but also to the contract drawings and the specifications (FF 8). In another reference to NFPA 70, the contract required that materials and equipment be installed in accordance with NFPA 70 and "as shown." (FF 7.) The contract clearly told Caddell and Henderson that there were requirements in addition to those in NFPA 70. The Government's direction to install one circuit in a conduit where shown on the drawings does not negate any part of NFPA 70 and incorporates all parts of the contract.

Henderson argues that it should have been allowed to install the circuits in accordance with what it believes is the industry standard. However, Henderson states: "It is extremely important to note that the design engineer recognized that it [is] both acceptable and standard in the industry to combine circuits in a single conduit and let them share a common neutral **unless something in the contract documents prohibited this installation method**." (Emphasis added. Tab 7, letter from Henderson to Caddell dated December 29, 2003.) While Henderson

[8] NFPA 70 is the same as the National Electric Code (FF 14)

acknowledges that the contract can specify a method of installation that might not coincide with the industry standard, it then ignores the clear requirements of the contract drawings where they do not coincide with what it believes is the industry standard. Again, Henderson's interpretation does not give effect to all parts of the contract, specifically the contract drawings. In addition, "industry standard" or a trade custom or practice cannot vary or contradict plain language in the contract. The government is free to require performance greater than the industry standard.

Henderson states that during the construction of the Dining Facility it was required to pull out numerous runs of conductors, install additional conduits and reinstall the circuits with a dedicated neutral conductor. Henderson seems to allege that the rejection of this work and the requirement to correct it was not done reasonably early in the contract performance, resulting in additional costs to Henderson to implement the Government's direction.

The Government is entitled to strict compliance with the contract requirements. In order to assure this compliance the contract places a responsibility on Caddell to maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to contract requirements (FF 5). Even if the Government inspects the work, this inspection does not relieve Caddell and Henderson of the responsibility to perform the work in accordance with the specifications and drawings. Because the contract drawings clearly describe how circuits may be combined in a conduit and when only one circuit must be installed in a conduit, Caddell's inspection procedures should have detected noncompliance with the contract during the construction of Phase I.

When the Government noted that in the construction of the buildings in Phase I of the project the installation of circuits did not comply with the contract requirements, it allowed compliance with only the requirements of NFPA 70 and not the additional requirements of the

contract (Tab 8). While Henderson complains that it was required to pull out numerous runs of conductors in the Dining Facility, once again the Government allowed the installation of the circuits to remain if the requirements of NFPA 70 were met (Tab 8).

While Henderson states that compliance with the Government's directive to follow the contract drawings was not "commercially practical" during the construction of the Dining Facility, Henderson also states that the Government did not require compliance in this situation (Tab 7, Henderson letter to Caddell dated December 29, 2003, page 11[9]). In its summary of costs, Henderson does not distinguish between costs to pull out and reinstall circuits in additional conduit in the Dining Facility and the costs to install additional conduit and wire in the buildings that had not yet been completed. Henderson has not shown what the cost was to correct the defective work and how it resulted in economic waste or was impractical.

Henderson argues that it is entitled to its interpretation of the contract drawings based on what it describes is a pattern on the part of the Government, specifically the U.S. Army Corps of Engineers, of interpreting contract drawings to allow "three-phase home run circuits grouped within a single conduit having a common neutral conductor." (Tab 7, Henderson letter to Caddell dated December 23, 2003, page 15.) This is consistent with what was allowed under the contract drawings. Henderson was not prohibited from combining circuits in a conduit in all situations, only where this practice was contrary to the explicit requirements of the contract drawings. Henderson has failed to explain how the Government waived this requirement through its administration of the three contracts listed in Henderson's letter (Tab 7, Henderson

---

[9] The letter states: "However… full compliance with the Government's interpretation of the contract requirements was no longer commercially practical. Not only were there a large number of the conduit homeruns to Electrical Room No. 144 … but many were run under the slab…. … By the time that Henderson Electric was directed to run the various circuits in separate conducts [sp] it no longer had access to Electrical Room No. 144. The … Corps of Engineers neither demanded a credit nor enforced its directive."

letter to Caddell dated December 23, 2003, page 15).

## CONCLUSIONS

I find that Government did not constructively change the contract and reasonably enforced compliance with the requirements of the contract. I find that the Government is not responsible for the costs of installing single circuits in a conduit where required by the contract. I find that the Government accepted nonconforming work resulting in no additional costs to Henderson. I find that the Government's actions were not inconsistent with Henderson's prior course of dealing with the Government. Therefore, I find no merit in this claim for the costs claimed. This is the final decision of the Contracting Officer in this matter. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, VA 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

Colleen O'Keefe

Colleen O'Keefe
Contracting Officer